[Civ. No. 8347. Third Dist. July 3, 1953.]

MILLER & LUX, INCORPORATED (a Corporation) et al., Appellants, v. THE BOARD OF SUPERVISORS OF THE COUNTY OF MERCED et al., Respondents; CENTRAL CALIFORNIA IRRIGATION DISTRICT, Real Party in Interest.

Linneman, Burgess, Telles & Van Atta, J. E. Woolley and Vincent J. McGovern for Appellants.

Don C. Mayes, C. Ray Robinson, James A. Cobey and Stephen W. Downey for Respondents.

VAN DYKE, P. J.—Petitioners below appeal from a judgment in certiorari affirming in all respects the proceedings taken before the Merced County Board of Supervisors to form the Central California Irrigation District. Miller & Lux Incorporated, a corporation, The San Joaquin Canal Company, a corporation, John N. Bettencourt, Manuel V. Bettencourt, George A. Zimmerman, William S. Koda and Edward K. Koda have dismissed their appeals.

Stated briefly, the Water Code, division 11, part 2, lays down the following requisites to the formation of an irrigation district. A petition for the formation of such a district must be prepared and circulated; the petition must contain, among other things, generally, a description of the land proposed to be included, a statement as to the source or sources of water supply and the signatures of the requisite number of qualified petitioners. (Wat. Code, § 20720 (a) and (b).) The requisite number of petitioners is either a majority in number and assessed value of the landowners or at least 500 petitioners, each of whom is an elector residing in the proposed district, or the holder of title to land therein, and who in the aggregate own not less than 20 per cent in assessed value of the land proposed to be included within the contemplated district. (Wat. Code, § 20700.) After the petition has been prepared, circulated and signed by the requisite

number of qualified persons, the petition, together with the notice of a hearing thereon before the board of supervisors must be published for at least two weeks, in newspapers of general circulation within the counties wherein the land lies. (Wat. Code, § 20740.) Following such publication, a preliminary formation hearing is held before the board. (Wat. Code, § 20800.) At this hearing the petition is presented to the board. (Wat. Code, § 20801.) Evidence is received in support of and in opposition to the *sufficiency of the petition* and *the publication thereof*. (Wat. Code, § 20802.) At the conclusion of this hearing the board determines by resolution whether or not the petition and the publication are sufficient. (Wat. Code, § 20804.) If it finds that they are it adopts what may be called the preliminary formation resolution. Following the adoption of this resolution a copy thereof is sent to the State Department of Public Works which has already received a copy of the petition. (Wat. Code, §§ 20821, 20820.) The department then makes a feasibility investigation of the irrigation project proposed in the petition and reports thereon in writing to the board of supervisors. (Wat. Code, §§ 20822, 20823.) Upon receipt of a report from the department the board of supervisors then sets, and gives notice of, the final formation hearing. (Wat. Code, §§ 20840, 20842.) At this hearing the board hears any newly discovered evidence against the sufficiency of the petition and the publication, and evidence in rebuttal thereof. (Wat. Code, § 20846.) At the conclusion of the final formation hearing the board of supervisors, if still so minded, adopts a final formation resolution which, among other things, reaffirms the sufficiency of the petition and the publication and describes the boundaries of the proposed district. (Wat. Code, §§ 20847, 20848.) The board then calls for an election to determine whether the qualified voters residing within the proposed district do or do not desire the district's formation. (Wat. Code, §§ 20890, 20527.)

In the matter of the formation of Central California Irrigation District these procedural steps were taken, and the election having resulted favorably, the district was duly declared by the board to have been formed. Thereafter the trial court, responsive to petition for certiorari, rendered the decision from which this appeal is taken, affirming and approving in all matters the proceedings had in the formation of the district.

Appellants here contend for reversal of the judgment appealed from as follows: That there was no evidence before the

board of supervisors to establish the jurisdictional facts necessary to sustain the board's authority to adopt and pass the formation resolutions. Specifically they urge that jurisdiction on the part of the board was lacking, because: (a) It did not have before it a sufficient petition in that the description of the proposed district is indefinite and uncertain, with the consequence that the lines of the proposed district cannot be ascertained; (b) It did not have before it any evidence as to the genuineness of signatures of persons purportedly signing the petition as landowners; (c) The petition and notice were not published in Madera County, such publication being required as the petition included lands in Madera County; (d) There was a failure to prove at the preliminary hearing that the petition had been signed by holders of title to not less than 20 per cent in value of the land to be included within the proposed district.

We will treat, first, of the matter of the sufficiency of the description. It appears that the San Joaquin Canal Company is and was at all times during the proceedings for the formation of the district a public utility engaged in supplying water to lands approximating 150,000 acres in extent and lying generally on the westerly side of the San Joaquin Valley within the counties of Fresno, Merced and Stanislaus. The petition stated "That a *general* description of the land proposed to be formed into a district is all that land embraced within the present service area of the San Joaquin Canal Company, a public utility, together with the land presently occupied by canal rights of way and headworks and lands immediately adjacent to said headworks, all of said public utility, but excluding from said service area the lands of Hamburg, et al., . . . , as having limited water service rights only." The petition then stated that there followed a written description of the boundaries of the proposed district as scaled from a certain map entitled "The San Joaquin Canal Company, Map of Service Area," said map being further identified by dates and by the name of the civil engineer who sponsored the map. The petition stated that the written description so prepared had been modified to show an exclusion of land from said service area which had been made by order of the Public Utilities Commission in a designated decision, and it was further stated that the map referred to had been filed for record in the offices of the county recorders of the three named counties, the recording

data being given. There then followed a metes and bounds description of the exterior boundaries of the various non-contiguous parcels of land proposed to be included within the district. There was also a description of lands proposed to be placed within the proposed district, but which lay outside of the service area of the utility and a description of certain lands proposed to be excluded from the proposed district which lay within said service area. The petition then stated, ''The said land is situated in the following three counties: Fresno, Merced and Stanislaus; and the greatest portion of the area of the land is situated in the county of Merced.'' (Under the provisions of the Water Code the Board of Supervisors of Merced County, that being the ''principal'' county, was given jurisdiction to act in the formation proceedings (Wat. Code, § 20518).) Those proposing the formation of the irrigation district employed a licensed civil engineer to undertake the preparation of the description of the land proposed to be included. He appeared as a witness before the board and testified as follows: That he had been instructed to prepare a description ''of the service area in the three counties'' of Merced, Stanislaus and Fresno; that the ''correct'' way of going about that would be by making an actual field survey; that such a method would have entailed great expense and much time and that in many cases the service lines of the utility lay across ownership lines so that many property owners did not know just where the service line lay; that he eliminated the idea of describing the lands by a survey; that it was desired to include in the district roughly the service area of the San Joaquin Canal Company; that he found no recorded maps on record at that time which showed this service area, so far as any line of demarcation was concerned; that he obtained a map outlining the service area which had been prepared by a Mr. Mott, chief engineer and manager of the utility, and a licensed surveyor; that he knew from experience that Mott's work was accurately done; that he took this map and from it delineated the descriptions around the perimeter with inclusions and exclusions; that it was a difficult job and very unsatisfactory, for many of the courses were short and it was difficult to determine their length and bearing (a photostatic copy of this basic map was received in evidence, the original of which had been recorded during the time the petition was being prepared); that he had been instructed to ''go around that service area and by metes and bounds indicate

the land that was proposed to be incorporated in the district''
and ''to include therein only land in the three counties of
Merced, Stanislaus and Fresno''; that he endeavored to do
this; that he took the entire service area map and broke it
up into three sections, one for each county; that he then
made large scale maps of sections of the lands in each county
and upon these projected the ownership plats of the county
assessors, so that these enlarged sections showed the owner-
ship of the included lands, together with a statement of the
acreage involved in each ownership; that the perimeter of
the service area alone measured over 200 miles and with
the various exclusions and inclusions another 50 miles or
more of boundary lines would be added; that in scaling the
service area map to obtain the metes and bounds described
he plotted over 1,100 courses; that the metes and bounds de-
scription included about 20 acres of barren swamp and over-
flowed land situated in Madera County; that the inclusion
of this land was a mistake; that the statement in the com-
pleted description following the metes and bounds that the
land described was within the three counties of Fresno, Merced
and Stanislaus he considered as eliminating the parcel in-
cluded within the metes and bounds description and lying in
Madera County; that although the method he followed in
arriving at a metes and bounds description of the area of
the proposed district was unsatisfactory, yet it was probably
within 2 or 3 per cent plus or minus correct in each area
and that to the best of his ability he had arrived at the
exact areas.

We think that the description of the proposed district was
sufficiently definite to meet the requirements of the statute.
Absolute accuracy, even by survey, was hardly to be expected
when so large an area of land and so many varying courses
and distances were involved. ▮ The statute does not
require absolute accuracy, but by its very terms calls only
for a ''*general*'' description of the land proposed to be in-
cluded. The problem presented to the engineer employed
to work out a description of the land was in this instance
peculiarly difficult. In the main, and except for some in-
clusions and exclusions, it was the intent of petitioners, as
shown by the petition itself, to form a district of all the land
embraced within the existing service area of the canal com-
pany. But this service area did not coincide with the owner-
ship of the various bodies of land, that is, as to owners whose
lands lay along the perimeter the service line often crossed

the ownership lines, leaving some land within and some without the service area. Under these circumstances, as the engineer testified, he procured a map prepared by the canal company engineer, which showed the service area, and which map had been used over many years for that purpose. With this as a foundation he took the steps hereinbefore outlined in his testimony. We think the evidence before the board which we have related, together with the maps prepared and described by the engineer, and received in evidence by the board, furnish sufficient foundation for the finding of the board that the petition contained a description *generally* of the lands proposed to be included. We say this notwithstanding that there was evidence that in some particulars the work had been inaccurately done so that parcels of land were included in the description found in the petition that were not within the service area as portrayed by the basic map.

Appellants contend that the board did not have before it any evidence as to the genuineness of signatures of persons signing the petition as landowners. At the preliminary hearing it was incumbent upon the board to determine whether or not the petition presented to it had been signed by the required number of electors residing within the proposed district and of owners of land owning not less than 20 per cent of the assessed value of all lands. (*Miller & Lux* v. *Board of Supervisors*, 189 Cal. 254 [208 P. 304].) Upon this matter the board took evidence, and we will summarize that of the principal witness, a Mr. Pearson. He testified that he had had considerable experience in title examination work and had been employed by the sponsors of the irrigation project to check the petition in the matter of signatures; that he and certain persons working under him had spent a period of four or five months in that work. He said that he first employed people familiar with the work in the assessors' offices in the various counties involved to make the actual search of the records in their respective counties and through this work to arrive at the total assessed valuation of all the land within the proposed boundaries of the district; that when this result had been achieved he then undertook with the same aid to determine the assessed valuation of land belonging to those people who were landowners who had signed the petition; that he had been furnished with the maps referred to in the testimony of the engineer for the proponents (that testimony we have hereinbefore narrated),

which were the maps received in evidence to show the lands proposed to be included within the district; that the sectionalized maps showed the ownership of the various parcels of land and the acreage thereof; that he checked these owners' names against the last equalized assessment roll to ascertain if the names of owners on the sectionalized maps corresponded with the names of owners shown on the assessors' records; that he also checked the signatures appearing on the petition with the signatures upon the uncanceled affidavits of registration to determine whether the people who signed the petition were presently registered voters; that from this examination and comparison he ascertained that 672 of the persons who signed the petition were either electors residing within the district proposed to be formed or the holders of title to land and improvements therein according to the assessment rolls; that he further ascertained from such examination and comparison that the total assessed value of all the land within the proposed district was the sum of $7,819,571 approximately; that the persons whose signatures were affixed to the petition included the holders to title of land within the proposed district aggregating approximately 24.69 per cent; that he had excluded about 130 names from his final lists for various reasons, but that after eliminating these names there were 672 signers remaining, which number included property owners having considerably in excess of 20 per cent of the assessed value of land within the proposed district. On cross-examination by counsel for opponents to the petition the witness further testified as follows: That he used the sectionalized maps as the basis for determining the assessed valuation in each county and that the information on these maps was checked against the maps in the respective assessors' offices; that where there was lack of identity between the names as they appeared on the petition and the documents of title he had searched he had made further inquiry to determine if the same person was involved; that there were few discrepancies of this sort and in some such cases he had gotten information from people who were familiar with the land itself, such as title office people; that if a signature in one place showed as John W. Jones and in another as J. W. Jones with the same acreage of land involved he assumed identity of person; that most of the people who owned land were registered voters; that as to those who were not he had no actual signatures to check against and in such cases checked the signature on the peti-

tion against the assessment records showing the ownership of the property.

We think the foregoing testimony was sufficient to support the board's findings that the petition had been signed by the requisite number of electors and landowners. To qualify as a signer the person must either be an elector within the district or a landowner therein. The witness ascertained that there were 672 signatures which included both classifications. This met the numerical requirement, assuming the witness properly reached his conclusion as to qualifications. This we think he did. These 672 were, as he said, for the most part electors and in those cases he checked their signatures on the petition with their signatures on the affidavits of registration. This was sufficient proof that the persons who signed the petition were also persons who were registered voters and whose affidavits of registration with their signatures were on file in the registrars' offices of the various counties. Included in the list of electors were owners of land, and some signers, although not electors, were owners of land within the district and so qualified to sign. This latter fact was sufficiently shown by a comparison of the ownership plats of the assessors' offices projected onto the district maps, it being competent for the board to conclude from the witness' testimony that the names of these signers corresponded with the names on the ownership books, and that there was in fact identity of signer and owner. (Code Civ. Proc., § 1963, subd. 25.) Thus there was substantial proof that 672 qualified persons had signed the petition and that included among them were the owners of land aggregating more than 20 per cent of the total assessed land value in the district, as reflected by the last equalized assessment roll appearing in the offices of the county assessors. The Water Code provides that for the purposes of a petition to form a district the county assessment roll of the county in which the land is situated last equalized at the time of the first publication of the petition is conclusive evidence of value and title. (§ 20569.) Appellants assert that although the uncanceled registration affidavits formed a proper basis for ascertaining that signatures on the petition were those of electors yet since no signatures appear upon the assessment rolls the persons purportedly signing as landowners were not identified nor in any way proved to be the actual persons of the same name owning land within the district. We do not agree. The witness sufficiently testified that while in such cases there was no chance to make a comparison of signatures, nevertheless sufficient names ap-

peared upon the petition that also appeared as owners upon the records checked that with the assumption of identity of person from identity of name the requisite percentage in assessed valuation was represented. We are unable to see, therefore, in what particular there was lack of substantial evidence before the board to justify its finding that in the matter of signers the petition met the statutory requirements.

 Appellants contend that because the petition was not published in Madera County the board failed through want of the statutory notice to obtain jurisdiction to act. A sufficient answer to this contention is to be found in the description of the land proposed to be included as it appeared in the petition when correlated with the right of the board in passing upon the matter of jurisdiction to construe the description. Concededly the metes and bounds description included some 20 acres of land in Madera County but the metes and bounds description was in this respect in conflict with two other limiting descriptions contained in the petition. The petition stated: "That a *general* description of the land proposed to be formed into a district is all that land embraced within the present service area of the San Joaquin Canal Company, a public utility, together with the land presently occupied by canal rights of way and headworks and lands immediately adjacent to said headworks." There then followed the metes and bounds description, which concluded with the statement, "The said land is situated in the following three counties: Fresno, Merced and Stanislaus." Undoubtedly the metes and bounds description included some 20 acres of land in Madera County, but this 20 acres was without the service area of the San Joaquin Canal Company and within the area of another like utility. The description does not expressly describe any land as lying within Madera County, but at the point in question, the metes and bounds description states that it crosses the San Joaquin River from west to east and further on recrosses from east to west, embracing the 20 acres of land east of the river. The Madera County line is judicially known at this point to be the center line of the San Joaquin River. The most that can be said with respect to the claimed inclusion of Madera County land is that the metes and bounds description conflicts with the statements that all of the lands described are within the service area of the San Joaquin Canal Company and within the counties of Fresno, Merced and Stanislaus. The uncertainty thus created could be resolved by the board and from its finding we must assume

that the board did resolve it when it found that publication in the three counties last named complied with the statutory requirement that the notice be published in all counties affected. Appellants argue that this conclusion cannot be arrived at in view of the declaration that the land proposed to be formed into a district included the headworks of the Canal Company service system. It was shown to be a fact that the headworks of the system consisted of the Mendota Dam across the San Joaquin River, so that, as appellants argue, the very specific description of this dam, one-half of which lay within Madera County, must be held to control the statement that the lands described lay within Fresno, Merced and Stanislaus Counties. We think, however, that this also was a matter for the board to determine, as was the matter of the 20 acres.

██ Finally, appellants contend that in sectionalizing those portions of the basic maps showing lands in Merced and Stanislaus Counties the sectionalized maps omitted a total of approximately 1,000 acres of land lying in those two counties and they argue that the witness Pearson, whose testimony we have narrated, did not take into his totals of assessed value the value of this omitted land, with the result, say appellants, that his calculations as to percentage of land value represented on the petition must be discarded. This contention involves an assumption that the witness arrived at his totals wholly from the sectionalized maps. While the testimony of the witness would support this assumption, it does not compel it. The witness testified that the proportion of the land and improvements included within the proposed district, the title to which was held by persons whose signatures were affixed to the petition, was approximately 24.20 per cent, and in any event not less than 23.09 per cent. When on cross-examination—and it is this testimony on which appellants rely—he said that he used the maps as a basis for determining the assessed valuation in each county, that he did not pay detailed attention to the metes and bounds description, that he assumed for the purpose of his work that the metes and bounds description contained the same area of land as shown on the maps, he did no more than to weaken, and not destroy, his testimony as to the total valuations and the percentage thereof represented in the petition. Appellants' objection is, in reality, that it is impossible to ascertain 20 per cent of an unascertained whole. Mathematically speaking, appellants are correct. But the law must often be satisfied with approximations and we think that such is the situation

here. The area of the land omitted amounted to but .66 per cent of about 150,000 acres of land. For this small percentage of land to have an assessed value high enough to destroy the 4 per cent · excess over the required 20 per cent would require it to be enormously valuable when compared with the average value throughout all the included area. We think it cannot be assumed that such disproportionate value existed and consequently that the evidence was sufficient, notwithstanding the omission, to justify the board's jurisdictional finding in respect of values.

The judgment appealed from is affirmed.

Schottky, J., and Bedeau, J. pro tem., concurred.

Appellants' petition for a hearing by the Supreme Court was denied August 27, 1953.