[Civ. No. 24823. Second Dist., Div. One. May 22, 1961.]

THE PEOPLE ex rel. STANLEY MOSK, as Attorney General, acting for and on behalf of the STATE LANDS COMMISSION, et al., Respondent, v. THE CITY OF SANTA BARBARA, Appellant.

Stanley L. Tomlinson, City Attorney, and John T. Rickard for Appellant.

Stanley Mosk, Attorney General, Bonnie Lee Martin, Deputy Attorney General, Vern B. Thomas, District Attorney (Santa Barbara), Robert Curiel, Deputy District Attorney, Oscar C. Sattinger, J. R. Elliott and R. D. Twomey, Jr., for Respondent.

FOURT, J.—This is an appeal by the city of Santa Barbara from a summary judgment (Code Civ. Proc., § 437c) entered on October 1, 1959, adjudging that "The annexation proceedings and the ordinances of annexation passed pursuant thereto . . . are null and void. . . ."

A résumé of the facts is as follows:

The annexation proceedings were initiated by the legislative body of the city of Santa Barbara (i.e., Council) on its own motion by Resolution Number 3162 adopted April 11, 1957. Both public and private owners of property were involved in the area to be annexed.

The State of California (hereinafter called "State"), owned certain lands (no assessed value) within the territory to be annexed which were under the exclusive jurisdiction and control of the State Lands Commission. The Regents of the University of California (hereinafter called "Regents"), also owned certain lands (no assessed value) within the territory to be annexed. The county of Santa Barbara (hereinafter called "County"), owned certain property within the territory to be annexed (no assessed value). The Pacific Lighting Gas Supply Company (hereinafter referred to as "Company") owned "property" *which was assessed* on the perti-

nent assessment roll and which was within the territory to be annexed. Finally, the city of Santa Barbara (hereinafter referred to as "City"), also owned property (some of which was assessed on the pertinent assessment roll and some of which was not assessed) within the territory to be annexed.

Before the hour set for hearing objections to the annexation, the State, the County, and the Company filed written protests with the Clerk of the City of Santa Barbara.

The record discloses that at the hearing on the protests the Council heard and passed upon all the protests made and that the protests of the State, County, and Company *were accepted by the Council as valid protests.*

In the "FINDINGS AND DETERMINATION OF THE COUNCIL OF THE CITY OF SANTA BARBARA IN THE MATTER OF THE UNINHABITED ANNEXATION OF 'THE SANCTUARY AND AIRPORT LANDS'" (Exhibit XVIII), dated May 23, 1957, it was found in pertinent part:

"3. That protestant Pacific Lighting Gas Supply Company *owns underground storage and mineral property,* a portion of which lies in the territory to be annexed, which portion is assessed in the last equalized County assessment roll available on the date proceedings were initiated at *$782,930.00.*[1] (Emphasis added.)

"4. That the Regents of the University of California, a corporation, is the owner of public property within the territory proposed to be annexed and has filed no protest herein. The value of such property included within the territory . . . is determined to be *$28,000.00,* including the land and improvements thereon.

"5. That the State of California through the State Lands Commission is owner of public property within the territory proposed to be annexed and has filed a written protest against annexation. The Council . . . determines the value to be given said public property for protest purposes to be *$1,600,-000.00,* including the land and improvements thereon.

"6. . . .

"7. That the value of the land and improvements thereon of all other property within the territory to be annexed, the

---

[1] The "BOARD ROLL OF STATE ASSESSED PROPERTY" (Exhibits C & D), discloses that the "Assessed Value For Purposes of Taxation" of Pacific's property was $2,950,000.

The sum of $782,930 represents that portion of Pacific's property assessed at $2,950,000 which is located in the territory annexed.

owners of which have filed written protest against this annexation is $ *none* as appears from the last equalized assessment roll of the County of Santa Barbara.

"8. That the value of public property owned by the City . . . within the territory to be annexed including the land and airport and industrial improvements thereon is determined to be *$5,121,000.00.*

"9. That the value of the entire territory to be annexed, including private and public property and the lands and improvements thereon, is determined to be *$7,531,930.00.*

"10. That the value of all protested public and private property within the territory proposed to be annexed is *$2,382,930.00,* including the land and improvements thereon.

"11. That protest has not been made by public and private owners of land equal in value to one-half of the value of the territory proposed to be annexed.

"12. That protests have been made by both public and private owners within the territory proposed to be annexed.

"Dated this *23rd* day of *May,* 1957."

The Council then enacted ORDINANCE NUMBER 2615 entitled, "AN ORDINANCE APPROVING THE ANNEXATION TO THE CITY OF SANTA BARBARA OF CERTAIN UNINHABITED TERRITORY DESIGNATED AS THE 'SANCTUARY AND AIRPORT LANDS' AND PROVIDING THAT THIS ORDINANCE SHALL TAKE EFFECT AS AN EMERGENCY MEASURE," and ORDINANCE NUMBER 2618 entitled, "AN ORDINANCE APPROVING THE ANNEXATION TO THE CITY OF SANTA BARBARA OF CERTAIN UNINHABITED TERRITORY DESIGNATED AS THE 'SANCTUARY AND AIRPORT LANDS.'" (Exhibits XIX and XX.)

Thereafter, on August 15, 1957, an action in quo warranto was filed by the State of California to challenge the aforesaid annexation. The State Lands Commission, Pacific Lighting Gas Supply Company, and the County of Santa Barbara were relators.

On February 13, 1958, a "FIRST AMENDED COMPLAINT IN QUO WARRANTO" was filed. The City filed a "NOTICE OF MOTION TO STRIKE" and a "DEMURRER TO FIRST AMENDED COMPLAINT" on March 13, 1958.

The appellant's (City) demurrer to the first amended complaint was overruled. Portions of the complaint were stricken and subsequently amended, but are not pertinent to the issues before this court.

The learned trial judge, on June 5, 1958, filed a "MEMO-

RANDUM'' pertaining to the aforesaid demurrer and motion to strike. Therein he stated in part:

''. . . In view of the comments made in this memorandum it may be that plaintiff will be content to rely upon its interpretation of [Gov. Code] Section 35313. If so, it would appear that after answer by the defendant (*i.e.* City), plaintiff's appropriate remedy would be by motion for summary judgment under the provisions of Section 437 (c) of the Code of Civil Procedure. Such a motion should, in my judgment, refer only to the protest of Company (*i.e.* Pacific) and its effect under Section 35313. This would provide a concise and inexpensive record on appeal and, if plaintiff's position is well-taken (as I believe it is), would obviate the necessity for any protracted proceedings in the trial court.''

Thereafter, on July 19, 1958, the City filed its ''ANSWER TO FIRST AMENDED COMPLAINT IN QUO WARRANTO AS AMENDED.'' On May 15, 1959, the plaintiff, in accordance with the trial court's suggestion, filed its ''NOTICE OF MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE PORTIONS OF ANSWER.''

Certified copies of all of the pertinent pages of the assessment roll were attached to plaintiff's (i.e., Company) affidavits in support of the motion. These exhibits contain the assessments for all of the assessed land and improvements within the territory to be annexed and establish that the *total assessed values* of all *taxable property* within the territory to be annexed, *except for the property owned by the Company,* was *$84,520* (i.e., total taxable land $39,020 and total taxable improvements $45,500).

As heretofore indicated, the ''Assessed Value for Purposes of Taxation'' of Pacific's (i.e., Company) property was $2,950,000 (see footnote No. 1). The assessment of Company's property appears in the ''BOARD ROLL OF STATE ASSESSED PROPERTY PREPARED BY THE STATE BOARD OF EQUALIZATION STATE OF CALIFORNIA SANTA BARBARA COUNTY 1956 VOL. 500'' and the pertinent page thereof indicates in pertinent part as follows:

| ''DESCRIPTION OF PROPERTY | ASSESSMENT NUMBER | 1 LAND | 2 | 3 |
|---|---|---|---|---|
| . . . | | Real Estate Except Improvements | . . . | . . . |
| ''MIN RTS ONLY | . . . | $2,950,000'' | | |

As shown above, the figure of $2,950,000 ·appears under the heading "LAND Real Estate Except Improvements" and not under the heading of "2. IMPROVEMENTS" or "3. PERSONAL PROPERTY Other Than Intangibles."

The "AFFIDAVIT OF BROLEY E. TRAVIS CONCERNING THE ADMINISTRATIVE PRACTICE OF THE STATE BOARD OF EQUALIZATION IN ASSESSING MINERAL RIGHTS AS LAND" (emphasis added) discloses that Mr. Travis is the "duly appointed, acting, and qualified Chief of the Valuation Division of the State Board of Equalization." This affidavit provides in pertinent part as follows:

"5. Since the State Board of Equalization began assessing public utility property in 1935, that Board has continuously and at all times during the period 1935-1953 shown such property on the Board Roll in only four columns: Land, Improvements, Personal Property, and Solvent Credits; and from 1954 to the present, that Board has consistently and at all times shown such property on the Board Roll in only three columns: Land, Improvements, and Personal Property, with Solvent Credits being shown on separate sheets as the last pages of the Board Roll; *and from 1953 to the present*, the period during which the State Board of Equalization has assessed public utility property, *it has been the consistent administrative practice of the Board to classify mineral rights as land* rather than as improvements, personal property, or solvent credits. (Emphasis added.)

"6. The attached page [i.e., see portion thereof set forth *supra*] . . . *showing the property of Pacific Lighting Gas Supply Company as mineral rights only, and classified as land*, represents and is consistent with the long-continued administrative practice of the . . . Board . . . *in classifying mineral rights as land*, rather than as improvements, personal property, or solvent credits." (Emphasis added.)

One of the duties of the State Board of Equalization is to prescribe rules and regulations governing local boards of equalization and county assessors when assessing property for taxation. In that connection the State Board prepares and issues instructions to assessors designed to promote uniformity in assessment of property for taxation and inspects the public records of local assessors.

All counties in the state have, since 1938, followed the State Board forms and instructions in the assessor's handbook published by the State Board. Pursuant to these forms ·

and instructions all counties have consistently classified property on their assessment rolls in only four columns or categories, to wit: land, improvements, personal property, and solvent credits.

The affidavits and exhibits submitted by the City in opposition to the motion for summary judgment do not dispute the accuracy and completeness and pertinency of the pages of the assessment roll. They do not dispute the administrative practices of the State Board of Equalization and the county assessors with regard to classification of assessed property in the aforesaid four categories.

The function of the trial court in considering a motion for summary judgment is to determine whether there exists a triable issue of fact. (*McHugh* v. *Howard,* 165 Cal. App.2d 169 [331 P.2d 674]; *Dawson* v. *Rash,* 160 Cal.App.2d 154 [324 P.2d 959]; *Doyle* v. *Hibernia Bank,* 156 Cal.App.2d 16 [319 P.2d 412]; *Enos* v. *Foster,* 155 Cal.App.2d 152 [317 P.2d 670].) Whether a triable issue of fact exists is determined by the sufficiency of the affidavits of the parties. (*Doyle* v. *Hibernia Bank, supra;* Code Civ. Proc., § 437c; *Dorsey* v. *City of Los Angeles,* 132 Cal.App.2d 716 [282 P.2d 997].) Where the affidavits do not present any triable issue of fact, then the problem is resolved into a question of law and the trial court determines the issues of law. (*Bank of America* v. *Casady,* 15 Cal.App.2d 163 [59 P.2d 444]; *Bromberg* v. *Bank of America,* 58 Cal.App.2d 1 [135 P.2d 689], affirming summary judgment where solely issues of law were presented.)

As stated in *Eagle Oil & Refining Co.* v. *Prentice,* 19 Cal.2d 553 at page 556 [122 P.2d 264]:

"Because the procedure is summary and presented on affidavits without the benefit of cross-examination, a trial by jury and opportunity to observe the demeanor of witnesses in giving their testimony, the affidavits filed on behalf of the defendant should be liberally construed to the end that he will not be summarily deprived of the full hearing available at a trial of the action and the rights incident thereto.

"The procedure is drastic and should be used with caution in order that it may not become a substitute for existing methods in the determination of issues of fact. [Citation.]

"For these reasons it may further be said that the affidavits of the moving party, the plaintiff in this case, should

be strictly construed and those of his opponent liberally construed. [Citations.] And in this connection it may be further observed that the better rule is that the facts alleged in the affidavits of the party against whom the motion is made must be accepted as true, and that such affidavits to be sufficient need not necessarily be composed wholly of strictly evidentiary facts. [Citation.]''

 It is, of course, fundamental that the granting of a summary judgment where a triable issue of fact or defense is shown constitutes reversible error. (*Travelers Indemnity Co.* v. *McIntosh,* 112 Cal.App.2d 177 [245 P.2d 1065]; *Rall* v. *Lovell,* 105 Cal.App.2d 507 [233 P.2d 681]; *Weichman* v. *Vetri,* 100 Cal.App.2d 177 [223 P.2d 288]; *Gillespie* v. *Hagan,* 94 Cal.App.2d 566 [211 P.2d 9]; *United States Fidelity & Guaranty Co.* v. *Sullivan,* 93 Cal.App.2d 559 [209 P.2d 429]; *Strauss* v. *Strauss,* 90 Cal.App.2d 757 [203 P.2d 857].)

Although a number of contentions have been raised by appellant, it is desirable to bring the crux of this controversy into sharp focus. The heart of the problem involves the interpretation of Government Code, section 35313, as amended in 1955, and operative at the time the annexation proceedings were instituted.

Section 35313 provided as follows: ''At the time set for hearing protests, or to which the hearing may have been continued, the legislative body shall hear and pass upon all protests so made. If protest is made by the owners of one-half of the value of the territory as shown by the last equalized assessment roll, or if protest is made by public and private owners equal to one-half of the value of the territory proposed to be annexed, further proceedings shall not be taken. The value to be given publicly owned property for protest purposes shall be determined by the legislative body. As used in this article, 'value of the territory' means the value of the land and improvements thereon.''

Specifically, two issues of law are raised. First, under section 35313 of the Government Code which provides two alternative methods of protesting an annexation, does the satisfaction of the first alternative deprive the legislative body (i.e., Council) of jurisdiction to proceed further with the annexation proceedings? Secondly, was the Company (i.e., Pacific) the owner ''of one-half of the value of the territory as shown by the last equalized assessment roll'' (i.e., ''value of the land and improvements thereon'')?

What was stated by this court in *Heller* v. *City Council*, 157 Cal.App.2d 441 [321 P.2d 97] is pertinent and dispositive of the first issue. Therein it is stated at page 449 as follows:

" '*Section 35313 as it presently stands provides two alternatives the existence of either of which could bar a city legislative body from further proceedings to annex uninhabited territory.* The first alternative provides that if protest is made by the owners of one-half of the value of the territory as shown by the last equalized assessment roll, further proceedings shall not be taken. The second alternative is that if protest is made by public and private owners equal to one-half of the value of the property proposed to be annexed, further proceedings shall not be taken. *It appears that if either alternative exists annexation is prohibited.*

" ' . . . *The latter alternative* concerning protest by both private and public owners *would seem to have no effect on the first alternative affording to private owners the means of making effective protest despite the amount of protesting or unprotesting publicly owned property involved.* The latter alternative would appear to be relevant and useful *only when protests by owners whose properties appear on the assessment roll are insufficient to halt the proceedings.*' " (Emphasis added.)

As so aptly and succinctly stated by the trial judge in his memorandum,[2] "It seems difficult to believe that it was the intention of the Legislature that Company could force a suspension of the annexation proceedings by its solitary protest but, when joined by Commission and County, all protests then became insufficient and the annexation was a valid one."

The second issue is whether Pacific was the owner "of one-half of the value of the territory as shown by the last assessment roll." The contention raised is that mineral rights are not "land." Should it be necessary to determine the *nature* of Pacific's mineral rights, then a triable issue of fact exists. Appellant attempts to utilize the definition of land as found in Civil Code, section 659, which provides as follows:

"Land. Land is the solid material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock, or other substance."

[2]Memorandum filed June 5, 1958, pertaining to the demurrer and the motion to strike.

As shown by the affidavit of Broley E. Travis, *supra*, ". . . from 1935 to the present, the period during which the State Board of Equalization has assessed public utility property, it has been the consistent administrative practice of the Board *to classify mineral rights as land* rather than as improvements, personal property, or solvent credits."

The reporter's transcript of the proceedings on the motion for summary judgment shows in pertinent part as follows:

"MR. RICKARD (Attorney for Appellant): I think it is purely a question of law whether mineral rights are to be considered as land within the meaning of this section. . . .

"THE COURT: . . . Mr. Rickard doesn't dispute what is in the assessment roll, how it appeared on the face of the assessment roll, what value was given to it. He does not raise the issue that if this property owned by Pacific was in fact land, then their protest represented a protest by more than fifty per cent. There is no question about that, is there?

"MR. RICKARD: No question. The first alternative would then be satisfied."

It is, of course, fundamental that a statute is to be construed to give effect to the legislative purpose. (*Krouser v. County of San Bernardino,* 29 Cal.2d 766, 772 [178 P.2d 441].) What was stated in the Krouser case at pages 769-771, is helpful in resolving the issue before this court.

"[T]he word 'land,' both in legal and popular parlance, more frequently than not includes both land and improvements. The use of the word 'land' as synonymous with real property has become its historical, ordinary and accepted meaning in connection with title, ownership, conveyance or transfer by deed or inheritance, with the exercise of the right of eminent domain, with execution sales and redemption, with dower, and similar evidences of ownership or modes of transfer. [Citations.]

"In assessing benefits under conservation district and similar statutes, it has been held that land is synonymous with real property and includes improvements. [Citation.] . . .

"In *Delaney v. Lowery,* 25 Cal.2d 561, 571 [154 P.2d 674], this court referred to both meanings of the word 'land,' and quoted extensively from 42 American Jurisprudence, Property, section 14, in holding that oil lease interests were real property within the broader and all-inclusive meaning of the word 'land.'

"*Southern Pacific Co. v. County of Riverside,* 35 Cal.App.

2d 380 [95 P.2d 688], involved the assessment provisions of the Storm Water District Act of 1909 (Stats. 1909, p. 339, as amended) and the question whether the terms 'land,' 'real property,' and 'land or any improvements thereon' were interchangeable. In arriving at an affirmative answer, the District Court of Appeal relied in part on *In re Haines,* 195 Cal. 605, 613 [234 P. 883]. In the latter case it was stated that words or clauses may be enlarged or restricted to effectuate the intention or to harmonize them with other expressed provisions; that general language may be restrained where to construe it in a broad sense would lead to absurdity; *and that the particular inquiry is not as to the abstract force of the words or what they may comprehend, but the sense in which they were intended to be used as found in the act.* (See also *In re Washer,* 200 Cal. 598, 604 [254 P. 951].)'' (Emphasis added.)

The Supreme Court in *People* v. *City of Palm Springs,* 51 Cal.2d 38 [331 P.2d 4], in discussing the "Annexation of Uninhabited Territory Act of 1939" (Stats. 1939, ch. 297, p. 1567; now Gov. Code, §§ 35300-35326), indicated that "land" as used therein, is used in its restricted sense. The definition as found in Civil Code, section 659, was used. The court stated at page 44:

" 'Land' means 'the solid material of the earth' (Civ. Code, § 659), and its value does not include the value of improvements thereon. [Citation.] 'Value of the territory' has not been so interpreted. [Citation.]''

While the Palm Springs case indicates that "land" means the solid material of the earth (as distinguished from the improvements thereon), it does not dispose of the issue before this court (i.e., classification of mineral rights as "land").

It has been the practice of the State Board of Equalization to classify "property" into four separate categories, to wit: land, improvements, personal property, and solvent credits. As indicated, "[I]t has been the consistent administrative practice of the Board *to classify mineral rights as land* . . .''

The problem presented may be stated as follows: Is the classification of "mineral rights as land" by the State Board of Equalization binding upon the council for purposes of determining whether, in accordance with Government Code, section 35313, "protest is made by the owners of one-half of the value of the territory as shown by the last equalized assessment roll . . . 'value of the territory' means the value

of the land and improvements thereon''? Or, to state the question in another way: Even though mineral rights are classified as ''land,'' may the council go behind the face of the assessment roll to determine *which of the mineral rights,* if any, come within the definition of ''land'' as set forth in Civil Code, section 659, and, thereafter, determine their value for purposes of ascertaining whether ''protest is made by the owners of one-half of the value of the territory''?

As indicated by the latter statement of the problem, if the council may go behind the assessment roll to make the re-classification, it would also be necessary for the council to readjust the value of the property as shown by the last equalized assessment roll (i.e., subtract from the value of the territory as shown by the assessment roll those mineral rights which did not constitute ''land'' within the meaning of Civil Code, section 659).

Although section 35313 has been amended several times, the Legislature each time has retained and employed the phrase *''as shown by the last equalized assessment roll.''* Use of the county assessment roll is a common method of establishing the value and classification of property for various purposes; e.g., incorporations, special assessments, special districts, as well as annexations. (See, for example, Government Code, sections 34303 [organization of new cities], 51552 [special assessments], 58700 [formation of districts], 61805 and 61806 [community service districts]; *Bryant* v. *Board of Supervisors,* 32 Cal.App. 495, 504 [163 P. 341] [storm water districts]; *Miller & Lux, Inc.* v. *Board of Supervisors,* 119 Cal.App.2d 29, 38 [258 P.2d 570] [Water Code, section 20700, irrigation districts]. See also *Security-First National Bank of Los Angeles* v. *Franchise Tax Board,* 55 Cal.2d 407, 422 [11 Cal.Rptr. 289, 359 P.2d 625].)

The words ''land'' and ''improvements'' in section 35313 refer to property shown on the assessment roll in the ''LAND Real Estate Except Improvements'' and ''IMPROVEMENTS'' columns. These words have the same meaning in section 35313 as those employed by the State Board of Equalization and the local assessor acting under the state board supervision, in classifying property for taxation. Otherwise the reference ''as shown by the last equalized assessment roll'' in section 35313 is meaningless.

By the express terms of section 35313, the council, in determining the value of private property, is directed to the

last equalized assessment roll. It is only in connection with publicly owned property that the council is empowered to determine its value.

Reference to the assessment roll provides a fixed and established method to determine the owner's right to protest the annexation. Since 1938 all counties in the State of California have conformed to the requirements of the State Board of Equalization concerning classification of property for assessment and they have classified property into only four categories (i.e., land, improvements, personal property, and solvent credits). As stated by the trial judge in his memorandum:

"City's (i.e. Council's) argument, followed to its logical conclusion, would lead, in annexation cases at least, to untold confusion and, in some instances, to manifestly undesirable results."

In *Heller* v. *City Council, supra,* 157 Cal.App.2d 441, at 449-450 it was stated: "In our opinion the Legislature carefully designed a procedure whereby the rights of private property owners and the public are protected in their right to protest annexation proceedings. Cities have been given great powers in the matter of annexations and with that power goes an equal responsibility to see to it that the power is not abused. It is of considerable importance to many landowners whether they be in a city or out of a city, and the utmost fair play by city authorities is called for."

There seems no doubt that the Legislature intended, insofar as private property is concerned, that the local council rely solely upon the assessment roll and that the council should not be permitted to "pierce" the assessment roll and make its independent determination of classification and valuation.

Next, appellant asserts that "the finding made by the Legislative Body of the City at the hearing on protests that a majority protest has not been presented in accordance with Government Code section 35313, as amended in 1955, is res judicata, conclusive and not subject to collateral attack in an action brought in quo warranto.[3]

---

[3] "Findings and Determination of the Council of the City of Santa Barbara in the Matter of the Uninhabited Annexation of 'The Sanctuary and Airport Lands'"

"11. That protest has not been made by public and private owners of land equal in value to one-half the value of the territory proposed to be annexed."

 Initially it must be noted that appellant has misconceived the nature of the attack in the present *quo warranto* proceedings. The case at bar involved a direct attack on the validity of the annexation proceedings.

As stated by Witkin, California Procedure, volume 3, pages 2043-2044:

"A direct attack . . . is more accurately described as a *proceeding instituted for the specific purpose* of vacating, reversing, or otherwise attacking the judgment. This more inclusive definition covers direct attack by independent action in equity . . . and by certiorari and other writs. [Citation.] The significance of the distinction between direct and collateral attack is this : If a judgment, no matter how erroneous, is within the jurisdiction of the court, it can only be reviewed and corrected by one of the established methods of direct attack. [Citations.] . . .

"A collateral attack is indirect : It is made, not in a proceeding brought for the specific purpose of attacking the judgment (direct attack, *supra*, § 1), but *incidentally in some other proceeding having a different purpose*. In a direct attack the judgment is *reviewed* for error, including jurisdictional defects. In a collateral attack the judgment comes up only incidentally, and may be effectively challenged only if it is so completely invalid as to require no ordinary review to annul it. [Citations.]

"The *grounds* for collateral attack—lack of jurisdiction of the subject matter or the person, or excess of jurisdiction— have been fully discussed elsewhere. [Citations.] There are of course no regular 'methods' of collateral attack. Any procedural challenge which does not constitute a direct attack . . . is collateral."

 It is established that *quo warranto* at the instance of the state is the proper method of testing the validity of a completed annexation proceeding. (*People* v. *City of Palm Springs, supra,* 51 Cal.2d 38, 41; *American Distilling Co.* v. *City Council of City of Sausalito,* 34 Cal.2d 660, 667 [212 P.2d 704, 18 A.L.R.2d 1247] ; *Hazelton* v. *City of San Diego,* 183 Cal.App.2d 131 [6 Cal.Rptr. 723] ; 34 Cal.Jur.2d, Municipal Corporations, § 83, pages 681-683; anno. 18 A.L.R.2d 1255 "Proper remedy or procedure for attacking legality of proceedings annexing territory to municipal corporation" and supplements thereto.)

The record shows that the Company (i.e., Pacific) owned

''one-half of the value of the territory as shown by the last equalized assessment roll.'' As stated by Judge Howden in his memorandum:

''The documents in support of the motion disclosed, without conflict, that more than 90% of the privately owned 'real property' in the territory proposed to be annexed was held by Pacific.''

We think that the first alternative mentioned in Government Code, section 35313, has been met and that, therefore, the council lost jurisdiction to proceed.

Under the circumstances, it becomes unnecessary to consider further any of appellant's remaining contentions.

The judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied June 21, 1961, and appellant's petition for a hearing by the Supreme Court was denied July 19, 1961.