[No. A030845. First Dist., Div. Three. May 12, 1987.]

PRUDENTIAL INSURANCE COMPANY OF AMERICA, Plaintiff and Respondent v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Appellant.

COUNSEL

Louise Renne, City Attorney, John J. Doherty and Robin Reitzes Manion, Deputy City Attorneys, for Defendant and Appellant.

Morrison & Foerster, Thomas H. Steele and Michael S. Powlen for Plaintiff and Respondent.

**OPINION**

**WHITE, P. J.**—This case involves a dispute between respondent Prudential Insurance Company of America (Prudential) and appellant City and County of San Francisco, as represented by its assessor's office (the Assessor), over the amount of real property taxes owed on a hotel purchased by Prudential. The central issue is whether a debt at a below-market interest rate which a buyer assumes from a seller must be discounted to its cash equivalent value in determining for purposes of property tax the value of the property sold. We hold that such discounting is required by state law. We also hold the court properly awarded Prudential attorney fees under Revenue and Taxation Code section 5152.[1] Finally, we reverse the judgment in part and direct the superior court to remand the case to the assessment appeals board (AAB) for resolution of factual questions related to the discounting.

## I. *Facts*

Prudential purchased the Hyatt on Union Square Hotel (hotel) from the Bank of America on July 31, 1980, for $85 million. Prudential paid $69,028,926.61 in cash and assumed a loan from the Bank of America of $15,971,073.39. The loan required monthly payments of $166,214.21 for an additional 12 years and 6 months at an 8 percent interest rate. At the time of this transaction the going rate for loans of this type was between 12 and 13 percent.

A dispute arose between Prudential and the Assessor regarding the hotel's value for purposes of assessment for the 1981-1982 tax year. Both parties agreed that the best evidence of the hotel's value was its purchase price. The Assessor assessed the value by subtracting from the purchase price the value of Prudential's personal property, arriving at a figure of $81 million. At a tax rate of 1.19 percent, he assessed Prudential $963,900 in property taxes.

Prudential filed an application for reduction of assessment with the AAB pursuant to section 1603. Prudential asserted that the Assessor had overvalued the hotel by failing to account for the below market interest rate loan which it had assumed from the Bank of America. Specifically, Prudential claimed that title 18, rule 4, of the California Administrative Code, required the Assessor to determine the cash equivalent value of the loan. Prudential estimated that after reducing the value of the loan to its cash equivalent, the taxable value of the hotel was approximately $76.4 million.

---

[1] All further statutory references are to the Revenue and Taxation Code unless otherwise indicated.

Experts for Prudential testified at the AAB hearing that in 1980, the year the hotel was purchased, the conditions for obtaining financing for hotel property were unfavorable. Interest rates were fluctuating and sellers were not taking back financing. Prudential's negotiator for the hotel testified that his recommendation to accept the $85 million purchase price took into consideration the 8 percent interest rate of the loan. Had the loan's interest rate been higher, Prudential would not have agreed to pay $85 million for the hotel.

The Assessor's position, represented by Assistant Chief Assessor McKenzie, was that discounting the value of the loan was inappropriate given the circumstances of the hotel's sale. The price was negotiated between two major companies, with a third party, Hyatt, as a major tenant. More importantly, the percentage of the loan vis-à-vis the purchase price, 18.8 percent, was quite low. Usually the loan greatly exceeds the amount paid in cash, and "as a loan becomes a smaller and smaller percentage of value, it's less and less useful and less and less apt to be assumed."

Mr. McKenzie also testified that while he did not disagree with the concept of cash equivalent adjustments, he did disagree with any rule which would require such adjustments in every case. He asserted that in his view, the application of rule 4 depends on the particular facts of a sale of property. In his experience, valuing property by cash equivalent adjustments does not necessarily correspond to the realities of the market. For the foregoing reasons, he opined that Prudential's loan should not be discounted to its cash equivalent value.

In a very brief written opinion, the AAB upheld the Assessor's valuation. The AAB stated: "Acting upon all the evidence properly before it the Board determined that the petitioner did not present sufficient evidence to overcome the presumption that the Assessor has placed the correct value on the tax roll."

Following this decision, Prudential filed a claim for refund of taxes with the San Francisco Board of Supervisors which was summarily denied. Prudential then filed a complaint in the superior court for refund of real property taxes paid. During these proceedings, Prudential moved for summary judgment, contending that it was entitled to a refund of $49,503.88[2] as a matter of law and that no issues of material fact existed. Prudential also moved for an award of attorney fees pursuant to section 5152. The Assessor opposed both motions. Against summary judgment, the

---

[2]The $49,503.88 figure was apparently arrived at by discounting the loan by $4,159,990, making the taxable value of the hotel $76 million. The tax owed on $76 million, at a rate of 1.19 percent, is $904,400, $59,000 less than Prudential actually paid.

Assessor offered the affidavit of Mr. Goodhue, an expert appraiser, who declared that Prudential's loan was not significantly different from the financing then available, and that the hotel's terms and price were within the "main stream" of transactions of this type. The superior court granted summary judgment and ordered the Assessor to pay $59,500,[3] plus interest and costs. The judgment included an award of attorney fees under section 5152. This appeal followed.

## II. *The Loan Must Be Adjusted to Its Cash Equivalent Value*

The central issue in this appeal is whether the discounting of Prudential's loan to its cash equivalent value was mandatory or discretionary. In addition to arguing that such discounting was discretionary, the Assessor contends that the superior court failed to defer to the AAB's finding that the assessment was proper. These issues appear to be interrelated. ■ The cases establish that where the superior court reviews the validity of an assessor's method of assessment—a legal question—it need not determine whether there was substantial evidence to support the AAB's decision (*Carlson* v. *Assessment Appeals Bd. 1* (1985) 167 Cal.App.3d 1004, 1009 [213 Cal.Rptr. 555]), but rather inquires into "whether the challenged method of valuation is arbitrary, in excess of discretion, or in violation of the standards prescribed by law." (*Bret Harte Inn, Inc.* v. *City and County of San Francisco* (1976) 16 Cal.3d 14, 23 [127 Cal.Rptr. 154, 544 P.2d 1354].) Where, however, the court is reviewing a "challenge[] to the result reached by the assessor after applying a sound valuation method" (*ibid.*), the court's task is to review "the entire record to determine if the findings are supported by substantial evidence" (*Hunt-Wesson Foods, Inc.* v. *County of Alameda* (1974) 41 Cal.App.3d 163, 176 [116 Cal.Rptr. 160]; see also *County of San Diego* v. *Assessment Appeals Bd. No. 2* (1983) 148 Cal.App.3d 548, 554-555 [195 Cal.Rptr. 895]), according deference to the factual findings made by the AAB. (*Georgia-Pacific Corp.* v. *County of Butte* (1974) 37 Cal.App.3d 461, 473 [112 Cal.Rptr. 327]; *Griffith* v. *County of Los Angeles* (1968) 267 Cal.App.2d 837, 841-842 [73 Cal.Rptr. 773].)[4]

In this case the parties agree that the comparable sales approach—using

---

[3]This figure included $9,996.12 in addition to the award of $49,503.88 attributable to the cash equivalent adjustment. The $9,996.12 overassessment was caused by a reduction in the hotel's original assessed value of $81 million to $80,159,990. The issues related to this portion of the judgment are not in controversy in this appeal.

[4]The Assessor claims that by not deferring to the AAB's decision the superior court impliedly overruled *Griffith*. That case, however, stands for the uncontroverted position that the resolution of factual questions by a local board of equalization is conclusive, and the superior court's role is merely to review factual determinations under the substantial evidence test. As *Bret Harte, supra,* points out, the resolution of legal questions by a local board of equalization is reviewable under a less restrictive standard.

the hotel's sale price as the best evidence of value—was the correct method of assessment.[5] The dispute concerns the proper application of that method. Generally such a question would be one of fact, requiring deference by the superior court to the AAB's findings. Here however, the sole issue at the AAB was the legal nature of rule 4 and the facts relevant to the cash-equivalent adjustment of the loan. If the rule is discretionary, then the issue before the superior court was whether that discretion was abused. Given the evidence that the circumstances of the hotel's sale did not warrant a conversion to cash-equivalent value, summary judgment would have been improper. If the rule is mandatory however, then the only issue before the superior court was one of law, and the court's role was to determine whether, in arriving at the hotel's value, the assessment was "in violation of the standards prescribed by law." (*Bret Harte Inn, Inc.* v. *City and County of San Francisco, supra,* 16 Cal.3d at p. 23.) The court could properly grant summary judgment upon finding the assessment violated state law.[6] Therefore, whether the superior court reviewed the AAB's decision under the correct standard rests entirely on the legal conclusion concerning the mandatory or discretionary nature of rule 4. ■ Since we conclude the rule is mandatory, we find the superior court applied the correct standard of review.

Our conclusion that conversion of Prudential's loan to its cash equivalent value was mandatory is based, first, on the legal definitions of "fair market value" which state that value is computed in terms of "cash or its equivalent"; second, on the mandatory language of rule 4 of title 18 of the California Administrative Code which requires conversion of debts to their cash equivalents; and third, on the expressed policy of the Legislature and the State Board of Equalization (the Board) that property be assessed by local assessors in a uniform manner.

■ A cardinal principle of property taxation is that property is ordinarily taxable at its "fair market value." (Cal. Const., art. XIII, § 1; § 110.5.) This phrase is defined by statute as "the amount of *cash or its equivalent* which property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of

---

[5]The comparable sales approach is the preferred method of determining value. (Cal. Admin. Code, tit. 18, rule 4.) This approach examines "[t]he price or prices at which the property and comparable properties have recently sold . . . ." (Cal. Admin. Code, tit. 18, rule 3, subd. (a).) Rule 4 states that the adjustment to cash equivalent value applies to sales of comparable properties as well as to the sale of the subject property.

[6]The Assessor contends that the AAB, in determining "that the petitioner did not present sufficient evidence to overcome the presumption that the Assessor has placed the correct value on the tax roll," never reached the cash equivalency issue. This assertion is improbable because the sole issue at the hearing before the AAB was whether the value of the loan should be discounted. Moreover, by finding that the hotel's correct value was the same as the value placed on it by the Assessor, the AAB almost certainly must have concluded that rule 4 was discretionary and not applicable to the instant case.

the other and both with knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used and of the enforceable restrictions upon those uses and purposes." (§ 110, italics added.) Stated in other words, this section provides "for an assessment at the price that property would bring to its owner if it were offered for sale on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other. It is a measure of desirability *translated into money amounts* [citation], and might be called the market value of property for use in its present condition." (*De Luz Homes, Inc.* v. *County of San Diego* (1955) 45 Cal.2d 546, 562 [290 P.2d 544], italics added.)

The definition of fair market value set forth administratively by the Board accords with the above statutory and judicial definitions. It reads in relevant part: "the words 'full value,' 'full cash value,' 'cash value,' 'actual value,' and 'fair market value,' mean the price at which a property, if exposed for sale in the open market with a reasonable time for the seller to find a purchaser, would transfer for *cash or its equivalent* under prevailing market conditions between parties who have knowledge of the uses to which the property may be put, both seeking to maximize their gains and neither being in a position to take advantage of the exigencies of the other." (Cal. Admin. Code, tit. 18, rule 2, italics added.)

These definitions stress that value for assessment purposes is determined by the market rather than by any particular value which the buyer or seller might place on the property. (State Bd. of Equalization, Assessors' Handbook —General Appraisal Manual (1982 rev.) p. 2 (hereafter General Appraisal Manual).) They also agree that the value which the market places on property must be measured by the amount of cash which the buyer would pay for and the seller would sell the property. Embodied in these definitions is the notion that "value is a ratio of exchange. Economic theory recognizes that changes in this ratio of exchange are expressed in increased or decreased prices; that is, the same amount of a commodity commands a greater or smaller number of dollars. In our society, money is the primary medium through which value is expressed. The courts, in formulating the concept of market value that is fundamental to the body of property tax law, have stressed that this value is the (highest) price *in terms of money*. Thus, we have an economic concept and a legal concept of value that are compatible." (*Id.,* at p. 9, original italics.)

The requirement that value be measured in terms of money essentially means that the part of the purchase price paid in a mode other than money, most typically the buyer's financing, must be converted to its money value. (State Bd. of Equalization, Assessors' Handbook—Cash Equivalent Analysis (Mar. 1985) p. 9 (hereafter Cash Equivalent Analysis).) Such conversion will

not significantly affect the determination of market value where, for instance, the characteristics of the noncash components of comparable properties are the same as those of the subject property, or the financing of the subject property is typical of that available in the market at the time of the sale. However, "any abnormal features of the financing, such as low or high interest rates or secondary financing, may well artificially inflate or depress the price and call for cash equivalent adjustments." (Ehrman & Flavin, Taxing Cal. Property (2d ed. 1979) § 17.5, p. 389, fn. omitted.) Where a buyer assumes a note from the seller, the assumption is that the buyer will pay more to obtain advantageous financing and less where the interest rate of the note exceeds the going market rate for such notes. Likewise, a seller will ordinarily compensate for a below-market interest note by raising the sale price, or lower the price if the assumable note makes the property less financially desirable to the buyer. (See General Appraisal Manual, *supra,* at p. 37; Cash Equivalent Analysis, *supra,* at p. 33.) It is evident, therefore, that basic to the concept of value is the necessity to adjust the price at which financing is obtained to its value in cash, especially where such adjustment will yield a different amount than the debt's face value.

The Legislature has authorized the Board to oversee the operation and functioning of local boards of equalization. Accordingly, "[t]he State Board of Equalization shall . . . [p]rescribe rules and regulations to govern local boards of equalization when equalizing, and assessors when assessing, . . ." (Gov. Code, § 15606, subd. (c).) Toward this end, the Board is empowered to issue "rules, regulations, instructions, and forms . . . ." (Gov. Code, § 15606, subd. (f).) The Board, pursuant to this authorization, has enacted administrative rules governing both local boards of equalization and assessors. (Cal. Admin. Code, tit. 18, rules 1-60; see *Midstate Theatres, Inc.* v. *County of Stanislaus* (1976) 55 Cal.App.3d 864, 879 [128 Cal.Rptr. 54].) One of these rules, rule 4, deals with the adjustment of sales prices to cash equivalents where the assessor is using the comparable sales approach to value. In relevant part, this rule states: "[T]he assessor shall: [¶] (a) Convert a noncash sale price to its cash equivalent by estimating the value in cash of any tangible or intangible property other than cash which the seller accepted in full or partial payment for the subject property and adding it to the cash portion of the sale price . . . . [¶] (b) When appraising an unencumbered-fee interest, (1) convert the sale price of a property encumbered with a debt to which the property remained subject to its unencumbered-fee price equivalent by adding to the sale price of the seller's equity the price for which it is estimated that such debt could have been sold under value-indicative conditions at the time the sale price was negotiated . . . ."

The context in which the administrative rules were enacted and the language of rule 4 itself evidence the mandatory nature of the rule. The Legis-

lature has directed the Board to promulgate rules governing the manner in which property is to be assessed. The administrative rules are an integral aspect of the Board's response to this charge. If their interpretation were subject to the discretion of local assessors, the Legislature's intent to invest the Board with the oversight of local boards of equalization would be subverted. As one authority has noted, the administrative rules were "issued pursuant to express legislative authority [Gov. Code, § 15606] and have the force and effect of law. The rules have received recognition by the courts in numerous decisions, and the courts will require assessors and local boards of equalization to abide by them. [¶] While some assessors continue to treat them, like the Assessors' Handbooks, as merely advisory in nature, it is clear that they are mandatory and binding not only on assessors, but also on local boards of equalization and assessment appeals boards." (Ehrman & Flavin, Taxing Cal. Property, *op. cit. supra,* § 17.3, p. 384, fns. omitted.)

Rule 4 on its face is a mandatory rule. It states that an assessor *"shall . . .* [¶] [c]onvert the sale price of a property encumbered with a debt to which the property remained subject to its unencumbered-fee price equivalent . . . ."* (Cal. Admin. Code, tit. 18, rule 4, italics added.) It therefore requires an assessor to convert the value of a loan assumed by a buyer to its fair market value. We can discern no language in the rule indicating that a local assessor has discretion in applying cash equivalent analysis to value an assumed debt.

The mandatory nature of rule 4 was demonstrated in *Midstate Theatres, Inc.* v. *County of Stanislaus, supra,* 55 Cal.App.3d 864, 880-881. There, an assessor, using the comparable sales approach to value, did not adjust the sales prices of the comparable properties under rule 4, but instead made an overall adjustment to take into account the dissimilarities of the comparables. He did not convert the prices into cash equivalents. The court posed the question as "not whether the assessor made the adjustments but whether he made them in a permissible manner." Rule 4 requires that conversion into cash equivalents be made, and the assessor's approach would "in practical terms . . . emasculate[] rule 4. . . . If rule 4 is to be considered as having any substance, the assessor must be prepared to show a separate consideration of and specific adjustment for noncash sales and differentials in time and size." (*Id.,* at p. 881.)

In addition to the mandatory nature of the administrative rules in general, and rule 4 in particular, mandating conversion to cash equivalents furthers the legislative objective of ensuring uniformity of assessments. This principle is manifest in both the statutes granting power to the Board and the Board's own instructions to assessors.

To carry out its oversight function of local assessors, the Legislature has commanded the Board to "[p]repare and issue instructions to assessors designed to promote uniformity throughout the state and its local taxing jurisdictions in the assessment of property for the purposes of taxation. It may adapt the instructions to varying local circumstances and to differences in the character and conditions of property subject to taxation as in its judgment is necessary to attain this uniformity." (Gov. Code, § 15606, subd. (e).) Another part of this statute authorizes the Board to "[b]ring an action in a court of competent jurisidiction to compel an assessor or any city or county tax official to comply with any provision of law, or any rule or regulation of the board adopted in accordance with [section 15606,] subdivision (c), governing the assessment or taxation of property." (Gov. Code, § 15606, subd. (h).)

A second statute which aims at securing uniformity of assessments requires the Board to survey the manner in which local property assessments are made (Gov. Code, §§ 15640-15646), addressing, among other questions, "the extent to which [local] assessment practices are consistent with or differ from state law and regulations." (Gov. Code, § 15642.) Further, there is a law which requires in certain circumstances an assessor who believes that property should be assessed in a manner contrary to law, owing to that law's invalidity, to bring an action for declaratory relief against the Board rather than making the assessment. (§ 538.) These statutes demonstrate that the Legislature intended that local assessors assess property in a like manner, and that deviations from the Board's rules be either approved by the Board or authorized judicially.

The Board has issued a handbook entitled the General Appraisal Manual which is "designed to promote uniformity in assessment of property for taxation . . . ." (*People* ex rel. *Mosk* v. *City of Santa Barbara* (1961) 192 Cal.App.2d 342, 348 [13 Cal.Rptr. 423].) The manual aids assessors in interpreting the law as formulated by the Legislature through statutes and the Board through regulations. In the manual the Board declares: "All assessors, appraisers, and local boards of equalization must have a uniform understanding of the basic concept of value to effectively carry out their function of producing a proper assessment roll." (General Appraisal Manual, *supra,* at p. 1.) On the subject of converting assumed loans to their cash equivalent value, the manual states: "Any 'paper' consideration, i.e., a promissory note received by the seller in exchange for his property, *must be* converted to its cash equivalent. The necessity for an adjustment will depend upon the terms of the instrument. *If the interest rate paid is not equal to the going rate of interest for similar real estate loans at the time of transaction, an adjustment will be necessary.* If the note's interest rate was lower than the going rate at the time of sale, it can be presumed that the holder of the note (i.e., the seller)

compensated for the lower rate by increasing the sale price; the value of the note should be discounted. If the note's interest rate was higher than the going rate and the note was well secured, it's a reasonable assumption that the holder compensated by lowering the sale price and that the note's value exceeds its face value." (*Id.,* at p. 37, second italics added.)

The above statements demonstrate that one of the Board's primary goals is to ensure that assessors in different counties use the same approach in determining market value given similar circumstances, and that the cash equivalent adjustment of loans whose interest rate differ from the market rate is necessary to further that goal.

 In his declaration in opposition to Prudential's motion for summary judgment, the Assessor's expert relied on the Board's handbook on Cash Equivalent Analysis, issued in March 1985. This handbook contains statements which support the Assessor's position that conversion to cash equivalents is, at least in some cases, discretionary. It declares: "Any policy stating that all selling prices comprised of elements other than cash must be adjusted, or that all trust deeds must be discounted, is incorrect. The facts in a given situation, such as whether the sale is in cash, financed by a loan with an interest rate not typical of the market, or financed by tangible property, determine the necessity for any cash equivalent adjustments to a selling price." (Cash Equivalent Analysis, *supra,* at p. 1.) More specifically, the handbook states: "An assumed loan must display an attractive loan price ratio in order to play a vital role in a transaction. One authority believes an assumable loan has no appeal should the loan-to-selling price ratio fall below 40 percent. Even when an assumable loan possesses a ratio of 50 to 60 percent, additional financing is often required. Thus it is unlikely that a cash-equivalent adjustment would be necessary when the buyer's down payment is 40 percent or more of the purchase price. An assumable loan must represent a substantial portion of the selling price before it becomes attractive and plays a dominant role in the transaction." (*Id.,* at pp. 45-46, fn. omitted.)[7]

As is evident, the handbooks' approaches to cash equivalent analysis are in conflict. The General Appraisal Manual posits that all loans assumed at an interest rate which varies from the market rate must be discounted, based on the assumption that the purchase price reflected this fact. The Cash Equivalent Analysis handbook, on the other hand, rejects this assumption

---

[7]This statement contradicts the earlier version of the handbook on Cash Equivalent Analysis, issued in 1976, which states that "[a]n existing promissory note with an interest rate lower than the market rate *must* be discounted." (Cash Equivalent Analysis, *supra,* at p. 29.) The 1976 handbook also contains an example in which a second deed of trust, representing about 13 percent of the purchase price, is adjusted to its cash equivalent value. (*Id.,* at pp. 45-46.)

where the loan consists of less than 40 percent of the purchase price. As noted, Prudential's loan made up only 18.8 percent of the hotel's purchase price.

Apparently the Board itself may be divided concerning the correct application of cash-equivalent analysis. However, even assuming the cash-equivalent analysis handbook, which is devoted to this subject alone and was issued after the General Appraisal Manual, represents the Board's true and current position on the subject, we do not find the handbook constitutes controlling authority.

The handbooks were issued by the Board to serve as a "primary reference" (General Appraisal Manual, *supra,* at p. i) and "basic guide" (*Gallagher* v. *Boller* (1964) 231 Cal.App.2d 482, 488 [41 Cal.Rptr. 880]) for assessors. They have also been relied upon by the courts in interpreting valuation questions posed by the state Constitution and statutes (*Cox Cable San Diego, Inc.* v. *County of San Diego* (1986) 185 Cal.App.3d 368, 377 [229 Cal.Rptr. 839]; *Carlson* v. *Assessment Appeals Bd. 1, supra,* 167 Cal.App.3d at p. 1013) and have been accorded "great weight" in this regard. (*Cox Cable San Diego, Inc.* v. *County of San Diego, supra,* at p. 377.) However, the handbooks do not contain the regulations, nor do they possess the force of law. They represent "merely the opinions of the State Board staff, and [have] no binding legal effect on boards, assessors, or taxpayers." (Ehrman & Flavin, Taxing Cal. Property (2d ed. 1986 supp.) com., § 16.5, p. 89.) Therefore, in any conflict between the handbooks and the regulations, the latter must govern.

In conclusion, we find that state law required the Assessor to value the loan assumed by Prudential at its cash equivalent. First, the statutory, administrative, and judicial definitions of fair market value all call for a calculation of value in terms of cash. Second, the Board has promulgated a rule which mandates conversion to cash equivalent value of a loan assumed by the buyer from the seller. Third, an across-the-board rule furthers the legislative policy of ensuring statewide uniformity of assessments. If adjustment to cash equivalent varied from county to county depending on an assessor's attitude toward cash equivalent analysis, this policy would be frustrated.

Finally, we are aware of statements in the Assessors' Handbooks emphasizing that cash-equivalent analysis "should not be reduced to an automatic mechanical function." (General Appraisal Manual, *supra,* at p. 39.) Our opinion is not intended to repudiate this position. Conversion of a sale price to its cash equivalent value does not necessarily represent the property's market value; rather, it is only a first step in arriving at market value. (Cash Equivalent Analysis, *supra,* at pp. 10-11.) Further adjustments may be neces-

sary, for example, to account for the buyer's ignorance or seller's lack of sophistication, which may have caused the purchase price not to have actually reflected the cash equivalent value of the financing. (*Id.,* at p. 10.) In this case, however, the Assessor failed to take the step of adjusting Prudential's loan to its cash equivalent, and this omission was error. Where a buyer assumes a loan from a seller at an interest rate different from the going market rate, rule 4 requires that a cash-equivalent adjustment be made.

### III. *The Attorney Fees Award Under Section 5152 Was Proper*

The superior court awarded Prudential attorney fees pursuant to section 5152. The Assessor argues this award was erroneous because (1) section 5152 entitles litigants to attorney fees only where the court is directly reviewing the actions of an assessor as opposed to an AAB decision; (2) the requirements of section 5152 were not satisfied; and (3) Prudential should have sought fees pursuant to Government Code section 800. We find the Assessor's arguments unpersuasive and affirm the award of attorney fees.

Section 5152 provides: "In an action in which the recovery of taxes is allowed by the court, if the court finds that the void assessment or void portion of the assessment was made in violation of a specific provision of the Constitution of the State of California, of this division, or of a rule or regulation of the board, and the assessor should have followed the procedures set forth in Section 538 in lieu of making the assessment, the plaintiff shall be entitled to reasonable attorney's fees as costs in addition to the other allowable costs. This section is ancillary only, and shall not be construed to create a new cause of action nor to be in lieu of any other provision of law."

The Assessor's first argument, that fees are justified only upon direct review of an assessor's actions, is based on the statutory language "*and the assessor* should have followed the procedures set forth in Section 538 . . . ." (§ 5152, italics added.) We do not agree that this language supports the Assessor's position. To recover attorney fees under section 5152 requires (1) a court finding that the void assessment or void portion of the assessment violated a specific provision of law, and (2) that the local assessor should have filed, pursuant to section 538, an action for declaratory relief against the State Board of Equalization instead of making the assessment. Neither of these provisions points to a legislative intention that entitlement to attorney fees turn on the procedural posture of the case. Further, under the Assessor's interpretation, section 5152 would apply where the taxpayer won relief at the AAB level but not where the AAB upheld an assessor and this ruling was reversed on appeal. Such an application of the statute would create an absurd result and should if possible be avoided. (*Silver* v. *Brown* (1966)

63 Cal.2d 841, 845 [48 Cal.Rptr. 609, 409 P.2d 689].) We can avoid this result by simply reading the statute in accordance with its plain meaning.

■ The Assessor sets forth two arguments disputing the applicability of section 5152's requirements to this case. First, he asserts that section 5152 authorizes attorney fees only where the assessment is void, and here the assessment, assuming it was wrong, was merely erroneous.

There are no reported cases interpreting the term "void" as used in section 5152. The Assessor relies on *Stenocord* v. *City etc. of San Francisco* (1970) 2 Cal.3d 984 [88 Cal.Rptr. 166, 471 P.2d 966], where "void" was defined in a case examining the circumstances under which a taxpayer may challenge an assessment without first exhausting his administrative remedies. Generally, exhaustion of administrative remedies is required, however, "[a]n exception is made when the assessment is a nullity as a matter of law because, for example, the property is tax exempt, nonexistent or outside the jurisdiction [citations], and no factual questions exist regarding the valuation of the property which, upon review by the board of equalization, might be resolved in the taxpayer's favor, thereby making further litigation unnecessary. [Citations.]" (*Id.,* at p. 987.) *Stenocord* further holds that a refund claim with the board of supervisors satisfies the exhaustion requirement "only in those cases wherein the assessment is totally void as an attempt to tax property not subject to taxation, rather than merely an inaccurate assessment of the value of taxable property." (*Id.,* at p. 990.)

Drawing an analogy to "void" as used in *Stenocord* and section 5152, the Assessor contends that a void assessment under section 5152 is one which taxes property which is exempt from taxation or is otherwise nontaxable. We believe, however, that the meaning of the term "void" as used in section 5152 is best discoverable by examining other references to the term in the statutory scheme within which section 5152 is located. (§§ 5081-5161, div. 1, pt. 9, chs. 4-5.) ■ We are guided by the rule of construction that "[w]hen used in a statute words must be construed in context, keeping in mind the nature and obvious purpose of the statute where they appear, and the various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." (*People* v. *Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104].)

■ We first examine sections 5097 and 5097.02. Subdivision (a) of section 5097 requires a taxpayer to file a claim for a refund before a refund order may be made. Section 5097.02, subdivision (a), states that such a claim must specify "[w]hether the whole assessment is claimed to be void or, if only a part, what portion." Subdivisions (b) and (d) of section 5097 indicate

that "void" in this context means any taxes collected of which the taxpayer is entitled to a refund. Subdivision (b) provides that "[a]n application for a reduction in an assessment filed pursuant to Section 1603 shall also constitute a sufficient claim for refund under this section . . . ." Section 1603, governing applications for reductions of assessments, does not require the assessment be "void." Subdivision (d) of section 5097 provides for a refund upon a judicial order if "the taxes paid were either of the following: [¶] (1) Erroneously or illegally collected. [¶] (2) Illegally assessed or levied." If section 5097.02, subdivision (a), is to be consistent with subdivisions (b) and (d), which allow refunds for erroneous assessments, then subdivision (a) must be interpreted to include not only assessments which are technically void, but erroneous ones as well.

The term "void" also appears in section 5144, which reads: "If the court finds that an assessment is void in whole or in part, it shall render judgment for the plaintiff for the amount of the taxes paid on that portion of the assessment that is found to be void. The taxes paid on the portion of the assessment not found to be void shall constitute valid taxes . . . ." Section 5143 provides: "If a claim for refund relates only to the validity of a portion of an assessment, an action may be brought under this article only as to that portion." The use of the term "void" in section 5144 appears to correspond in meaning with the term "validity" in the statute preceding it, implying that "void" refers to any taxes which are invalid. An invalid tax logically means any assessment which the taxpayer is not legally responsible for paying. (See *Kaiser Center, Inc.* v. *County of Alameda* (1987) 189 Cal.App.3d 978, 984, fn. 5 [234 Cal.Rptr. 603] [portion of assessment not supported by substantial evidence found void under section 5144].) Therefore, if "void" as used in section 5152 is to have the same meaning that it has in sections 5097.02 and 5144, it must be interpreted not only in a literal sense, but as synonymous with "erroneous."

In addition, reading the term "void" as the Assessor suggests would create ambiguity in sections 5097.02, 5144 and 5152. Each of these statutes refer not only to "void" assessments, but also to assessments which are void in "part." It is difficult to conceive of an assessment on property that is not subject to taxation but is only partially void. Property is either taxable or it is not. Interpreting the word "void" to include an overassessment on taxable property would avoid injecting ambiguity into these statutes, and would accord with the rule providing that construction of statutes give effect to every word, phrase and provision. (*Anthony* v. *Superior Court* (1980) 109 Cal.App.3d 346, 355 [167 Cal.Rptr. 246].)

Finally, a commonsense reading of section 5152 itself indicates that the Legislature did not use the word "void" to establish an additional require-

ment for the recovery of attorney fees. Had the Legislature meant the statute to apply only to assessments on nontaxable property, it could either have explicitly said so, or written the statute to read, "if the court finds the assessment or a portion thereof is void." The statute, as it actually reads ("if the court finds the void assessment or void portion of the assessment was made in violation of a specific provision . . ."), does not contemplate a judicial finding of voidness. For the foregoing reasons, we interpret section 5152 as entitling litigants to attorney fees upon a showing either of an erroneous assessment on taxable property or an assessment on nontaxable property.

■ The Assessor contends that section 5152 is inapplicable to this case because he was not required to bring an action for declaratory relief against the Board under section 538 instead of making the assessment. Section 538, enacted simultaneously with section 5152, provides in relevant part: "(a) If the assessor believes that a specific provision of the Constitution of the State of California, of this division, or of a rule or regulation of the board is unconstitutional or invalid, and as a result thereof concludes that property should be assessed in a manner contrary to such provision, or the assessor proposes to adopt general interpretation of a specific provision of the [foregoing laws], that would result in a denial to five or more assessees in that county of an exemption, in whole or in part, of their property from property taxation, the assessor shall, in lieu of making such an assessment, bring an action for declaratory relief against the board under Section 1060 of the Code of Civil Procedure. . . ."

The question at bar is whether the Assessor believed rule 4 of the Administrative Code was "unconstitutional or invalid." Since the application of section 538 rests on the belief of the local assessor, we must examine Mr. McKenzie's testimony at the AAB hearing to determine his state of mind. Mr. McKenzie testified that he did not disagree in principle with the concept of discounting to cash equivalent value. However, he did disagree with the expression of this concept in rule 4. He testified:

"[Q]: Do you disagree with [rule 4]?

"A: Probably to a—yes.

"Q: You do disagree, then, with the rule promulgated by the State Board of Equalization for guiding the equalization of assessment throughout the State; is that correct?

"A: Taken at its face value, yes, the way it's stated."

We think this testimony provides sufficient evidence of the Assessor's belief of the invalidity of rule 4 to trigger the application of section 538. The

Assessor's argument that he did not disagree with rule 4 in general but only with its application to this case is unavailing. First, his testimony was that rule 4 on its face is incorrect. Second, we see no difference for purposes of section 538 whether an assessor believes a rule is unconstitutional or invalid on its face or as applied to a particular case. In either instance the result is that the property is "assessed in a manner contrary to such provision." Moreover, the refusal to apply a mandatory rule frustrates the obvious purpose of section 538 of ensuring that local assessors interpret the Board's rules and regulations in like manner. If the Assessor believed that rule 4 should not apply where a loan represents less than 50 percent of the sale price, he should have brought an action for declaratory relief against the Board. The incorporation of section 538 into section 5152 was most likely intended to provide litigants with a powerful remedy for violations of section 538.

■ The Assessor's final argument against the attorney fees award is that section 800 of the Government Code rather than section 5152 is the controlling statute. The former statute reads in part: "In any civil action to appeal or review the award, finding, or other determination of any administrative proceeding under this code or under any other provision of state law, . . . where it is shown that the award, finding, or other determination of such proceeding was the result of arbitrary or capricious action or conduct by a public entity or an officer thereof in his official capacity, the complainant if he prevails in the civil action may collect reasonable attorney's fees, but not to exceed one thousand five hundred dollars ($1,500), where he is personally obligated to pay such fees, from such public entity, in addition to any other relief granted or other costs awarded."

The Assessor points out that Government Code section 800 has been applied to property tax disputes. (*Madonna* v. *County of San Luis Obispo* (1974) 39 Cal.App.3d 57, 61-62 [113 Cal.Rptr. 916].) However, the applicability of Government Code section 800 to this case does not necessarily mean section 5152 was not applicable. Indeed, for section 5152 to have any legal force, it must be interpreted to apply to cases falling within its provisions, even if Government Code section 800 is also applicable. Moreover, where two statutes concern a particular subject, application of the specific over the general one is favored. (*Bailey* v. *Superior Court* (1977) 19 Cal.3d 970, 976-977, fn. 8 [140 Cal.Rptr. 669, 568 P.2d 394].) Finally, in enacting section 5152 (and section 538) as emergency legislation, the Legislature unequivocally expressed its intention: "Certain assessors have chosen not to follow [the property tax laws], resulting in assessments causing the very hardship sought by the Legislature to be avoided. This act must go into effect immediately to eliminate the further potential harm from such action by assessors, . . ." (Stats. 1978, ch. 1188, § 4, p. 3840.) It appears therefore that section 5152 was intended as a primary tool to compel local assessors to follow state

property tax law. Its application in this case furthers this legislative goal. We hold that the superior court acted within its authority in awarding Prudential attorney fees pursuant to section 5152.

### IV. *The Superior Court Must Remand to the AAB*

The Assessor contends that instead of entering a money judgment for Prudential, the superior court should have remanded to the AAB for a determination of market value. The cases establish that the key question concerning remand is whether there remain factual determinations to be made in establishing market value.[8] Thus, where an assessor's method of assessing was found unconstitutional, remand was required because the court could not determine what proper method such assessor would choose. *(Georgia-Pacific Corp.* v. *County of Butte, supra,* 37 Cal.App.3d 461, 478.) Or, where a local board of equalization failed to consider conflicts in the evidence over the proper method of assessment the court could not substitute its judgment as to how the local board would have resolved the conflict. *(Universal Cons. Oil Co.* v. *Byram* (1944) 25 Cal.2d 353, 362-363 [153 P.2d 746]; see also *Kaiser Center, Inc.* v. *County of Alameda, supra,* 189 Cal.App.3d 978, 983-984 [remand required where court found value set by AAB not supported by substantial evidence].) In contrast, where a local board erroneously determined the type of property interest which the taxpayer possessed, the court could fix the value by correcting the error and then applying the local board's mathematical formula. *(Parr-Richmond Industrial Corp.* v. *Boyd* (1954) 43 Cal.2d 157, 168-169 [272 P.2d 16].)

Applying this standard, we believe the superior court should have remanded the case to the AAB because, in granting summary judgment and entering a money judgment in favor of Prudential, the court necessarily made certain factual findings. Such findings and the ultimate determination of the hotel's market value were properly within the province of the AAB.

To aid the parties and the AAB upon remand, we define the proper scope of the new hearing before the AAB. We emphasize that the new hearing should not be considered as de novo. Remand is required because in not applying cash-equivalent analysis to Prudential's loan, the AAB was not required to reach factual conclusions necessary to arrive at the hotel's market value. Therefore, the new hearing should be limited to consideration of such

---

[8]The necessity to remand such cases arises because the state Constitution confers on local boards of equalization and assessment appeals boards the power to equalize the value of property on the local assessment role. (Cal. Const., art. XIII, § 16; *Hunt-Wesson Foods, Inc., supra,* 41 Cal.App.3d 163, 175-176.) Thus, "in the absence of fraud or arbitrary use of its powers the board is the sole judge of questions of fact and of the values of property." *(Hunt-Wesson Foods, Inc., supra,* at p. 177.)

issues only, i.e., the proper application of cash-equivalent analysis to Prudential's loan. Such issues would include the determination of the exact market interest rate for loans on purchases of hotels at the time the loan was assumed. Concerning facts through which the Assessor may wish to demonstrate that the hotel's purchase price adjusted to its cash-equivalent value does not represent its market value, we believe the parties had ample opportunity to explore such questions at the initial AAB hearing; the AAB's consideration of such facts, therefore, should be limited to those already in the record of that hearing.[9]

Finally, we do not believe remand is necessary as to the portion of the judgment awarding Prudential $9,996.12 (see *ante,* fn. 3). This amount was not a subject of dispute at the AAB hearing, and the Assessor admits this money was owed to Prudential. As there was no question of fact before the superior court concerning the $9,996.12, the court acted within its authority in entering judgment for this amount.

## V. *Disposition.*

The superior court's grant of summary judgment, insofar as it (1) awards Prudential $9,996.12 as a refund for taxes paid, and (2) awards Prudential attorney fees pursuant to section 5152, is affirmed. That part of the judgment awarding Prudential $49,503.88 as a refund for taxes paid is reversed, and the court is directed to remand the matter to the Assessment Appeals Board for a determination of the hotel's value, as explained herein. Respondent is awarded costs.

Scott, J., and Barry-Deal, J., concurred.

A petition for a rehearing was denied June 10, 1987, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 29, 1987.

---

[9]The Assessor contends that our remand order limiting the scope of the new AAB hearing is inconsistent with the full evidentiary hearings ordered in *Kaiser Center, Inc.* v. *County of Alameda, supra,* 189 Cal.App.3d 978, 984-985, and *Georgia-Pacific Corp.* v. *County of Butte, supra,* 37 Cal.App.3d 461, 477-478. However, those orders were appropriate in view of the insufficiency of the evidence of value in *Kaiser Center* and the unconstitutionality of the method of valuation in *Georgia-Pacific.* Here, the problem was an improper application of a valid valuation method, and therefore it is appropriate to limit the evidence to that necessary to rectify the AAB's erroneous application. Considerations of fairness and judicial economy also support not permitting the Assessor to now pursue a different valuation method.