Filed 7/21/14  Modified 8/14/14; Certified for Publication 8/13/14  (orders attached)

# COURT OF APPEAL, FOURTH APPELLATE DISTRICT
## DIVISION ONE
## STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO GAS & ELECTRIC COMPANY,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>ARNOLD J. SCHMIDT, as Cotrustee, etc., et al.,<br><br>      Defendants and Appellants;<br><br>VALERIE SCHMIDT, as Cotrustee, etc.,<br><br>      Defendant and Respondent. | D062671<br><br><br>(Super. Ct. No.<br>37-2010-00094931-CU-EI-CTL) |
| SAN DIEGO GAS & ELECTRIC COMPANY,<br><br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>ARNOLD J. SCHMIDT et al.,<br><br>      Defendants and Appellants. | (Super. Ct. No.<br>37-2010-00094934-CU-EI-CTL) |

APPEAL and cross-appeal from a judgment and orders of the Superior Court of San Diego County, Timothy B. Taylor, Judge.  Affirmed in part and reversed in part.

San Diego Gas & Electric Company and C. Larry Davis; Horvitz & Levy, John A. Taylor, Jr., Daniel J. Gonzalez; Bartz Law Firm and Linda D. Bartz for Plaintiff and Appellant.

Rutan & Tucker, David B. Cosgrove, Alan B. Fenstermacher; Niddrie Fish & Adams and David A. Niddrie for Defendants and Appellants and for Defendant and Respondent.

Plaintiff San Diego Gas & Electric Company (SDG&E) initiated this eminent domain proceeding to condemn an easement for electric transmission lines across the property of defendants Arnold and Valerie Schmidt and Luis Naranjo (collectively defendants) after the parties could not agree on an appropriate valuation for the property. Agreeing with defendants' experts that an open-pit mining operation was the "highest and best use" for the land, the jury valued the property at about $8 million. SDG&E appeals, contending the judgment and order denying its motion for judgment notwithstanding the verdict (JNOV) must be reversed. SDG&E argues that the evidence was legally insufficient to support the jury's verdict. SDG&E also contends it is entitled to a new trial because the trial court abused its discretion in (1) limiting the cross-examination of defendants' appraisal expert and (2) allowing the appraiser to testify in violation of Evidence Code section 819. Defendants cross-appeal, asserting the trial court erred in denying their request for litigation expenses under Code of Civil Procedure section 1250.410. (Undesignated statutory references are to the Code of Civil Procedure.) We reject SDG&E's arguments and affirm the judgment and order denying JNOV. We reverse the order denying defendants' motion for litigation expenses.

GENERAL FACTUAL AND PROCEDURAL BACKGROUND

SDG&E filed two complaints for condemnation, one for each of two contiguous parcels of vacant land owned by defendants, and over which it required easements for its Sunrise Powerlink Transmission Project. Defendants' property totals 115 acres and is located near Highway 67 in the Lakeside area of San Diego County (the County). The

2

easements included 300-foot wide corridors on which SDG&E erected transmission towers, power transmission lines and transmission supply access pads. On June 25, 2010, SDG&E deposited the probable compensation for the property, establishing this date as the "date of valuation" for a final determination of just compensation. (§ 1263.110, subd. (a).)

Because the parties could not agree on the amount of just compensation to which defendants were entitled, the case proceeded to trial on this issue. Before trial, the court denied SDG&E's in limine motions to exclude the testimony of defendants' experts. At trial, the jury heard evidence from SDG&E's real estate appraiser that residential development or habitat mitigation was the highest and best use for defendants' land. SDG&E concluded that $712,200 constituted just compensation for the property. SDG&E's appraiser assumed it was physically possible to mine the property and that such use would be legally permissible upon the issuance of a major use permit (MUP), but did not assess the probability of defendants obtaining a MUP to mine the property and had no opinion on the likelihood of defendants' obtaining such a permit.

Defendants believed that the highest and best use for their land before SDG&E's taking was a granite mining operation. Briefly, defendants' mining expert, Warren Coalson, opined that a "very competitive aggregate environment" existed in San Diego and "there would be takers" if the property were offered for mining as existing sites would be depleted in the next few years. The property was zoned for mining and defendants presented evidence that it was sandwiched on both the north and south by properties owned by a mining operator, Hanson Aggregates (Hanson), that held about

3

950 acres in that area. Hanson had previously approached defendants about leasing the property for mining, but these discussions ended as a result of SDG&E's taking of the property. Vincent Scheidt, defendants' biological expert, performed a biological survey of defendants' property. Scheidt stated an issue existed regarding the removal of coastal sage scrub from the property for the mining operation, but this issue would arise for any type of development and could be addressed through the purchase of mitigation credits.

Defendants also presented Orell Anderson, a real estate appraiser experienced in appraising property for mining. For appraisal purposes, Anderson stated that defendants' parcels had a unity of use such that they should be viewed together in determining their highest and best use. He testified that appraisers use four tests to determine the highest and best use for a property; namely, whether a use is physically possible, legally permissible, economically feasible and maximally productive. After applying all four tests to the property in its before condition and consulting with other experts, including Coalson and Scheidt, Anderson concluded that the highest and best use of the property would be to lease it for aggregate mining.

Anderson testified that a MUP was required to mine the property and that the property did not have such a permit, but it was legally permissible to obtain such a permit. Using a discounted cash flow method, Anderson determined the value of the property based on the present value of the property's projected rental income stream from mineral royalties. Using this method, Anderson opined the "before condition" value of the subject property was $10,359,000, the value of the "part taken" was $1,877,000, and the severance damages were $6,622,000. The total just compensation was $8,499,000.

4

The jury returned a verdict close to Anderson's figures. The jury agreed with Anderson regarding the value of the land in the before condition and the value of the part taken, but lowered the severance damages to $6,157,000, resulting in total compensation to defendants of $8,034,000.

SDG&E moved for new trial and JNOV, arguing that substantial evidence did not support the verdict. It also argued that the trial court improperly limited the testimony of its appraiser and cross-examination of defendants' appraiser. In a lengthy ruling, the trial court denied both motions. The trial court found Coalson credibly testified that the County was running out of aggregate mines, the location minimized likely opposition and permit processing time on other mines has been shorter than what SDG&E predicted for this theoretical mine. The court concluded that the evidence supported the verdict, specifically noting that Coalson's opinions "were unchallenged by SDG&E due to its fatal strategic error in not naming a mining expert of its own."

SDG&E timely appealed from the judgment and the denial of JNOV. Defendants timely appealed from the order denying their motion for litigation expenses.

DISCUSSION

I. *SDG&E's Appeal*

A. Legally Sufficient Evidence Supported the Jury's Verdict

1. General Legal Principles

Owners of private property taken for public use are entitled to just compensation for the full monetary equivalent of the property as of the date of the taking. (*Almota Farmers Elevator & Warehouse Co. v. United States* (1973) 409 U.S. 470, 473.) If

5

possible, owners should be placed in the same monetary position they would have been without the taking. (*United States v. Reynolds* (1970) 397 U.S. 14, 16.) The measure of just compensation to be awarded for the property taken is the fair market value of that property (§ 1263.310), meaning "the highest price on the date of valuation that would be agreed to by a seller, being willing to sell but under no particular or urgent necessity for so doing, nor obliged to sell, and a buyer, being ready, willing, and able to buy but under no particular necessity for so doing, each dealing with the other with full knowledge of all the uses and purposes for which the property is reasonably adaptable and available." (§ 1263.320, subd. (a).)

The jury determines the fair market value of the property based on the highest and best use for which the property is geographically and economically adaptable. (*San Diego Metropolitan Transit Development Bd. v. Cushman* (1997) 53 Cal.App.4th 918, 925 (*Cushman*); CACI No. 3502.) Section 501 of the State Board of Equalization Assessors' Handbook (Handbook) states that "[h]ighest and best use is perhaps the most fundamental concept in real estate appraisal." (Handbook, § 501 at p. 48.) The highest and best use is defined as "that use, among the possible alternative uses, that is physically practical, legally permissible, market supportable, and most economically feasible . . . . The appraiser must make a determination of highest and best use as part of the appraisal process." (*Ibid.*; see 11 Miller & Starr, Cal. Real Est. (3d ed. 2011) § 30A:25, pp. 55-56 (Miller & Starr).) Courts may rely upon assessor handbooks in the interpretation of valuation questions. (*Prudential Ins. Co. v. City and County of San Francisco* (1987) 191 Cal.App.3d 1142, 1155.)

6

The highest and best use for which the property is adaptable may not be its current use. (See *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 863, 869 [evidence that residential property could be used in the future as airport parking properly admitted]; *People ex rel. Dept. of Water Resources v. Andresen* (1987) 193 Cal.App.3d 1144, 1159-1160 (*Andresen*) [condemnee properly tendered evidence that property was suitable as a proposed rock quarry].) "The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered, not necessarily as the measure of value, but to the full extent that the prospect of demand for such use affects the market value while the property is privately held." (*Olson v. United States* (1934) 292 U.S. 246, 255.) After the highest and best use of the property has been determined, the Evidence Code sets forth various methodologies sanctioned for use by valuation experts for determining the market value of property. (*Cushman*, *supra*, 53 Cal.App.4th at p. 926.) The Evidence Code codifies three basic methods of appraising real property, including income capitalization (Evid. Code, § 819), reproduction costs (Evid. Code, § 820) and comparative sale data (Evid. Code, §§ 816, 818).

"The right to future exploitation of undeveloped natural resources has a present and ascertainable value for purposes of eminent domain." (*City of Stockton v. Albert Brocchini Farms, Inc.* (2001) 92 Cal.App.4th 193, 199 (*Brocchini Farms*).) Accordingly, "'[i]n determining just compensation in eminent domain proceedings, the existence of valuable mineral deposits in the land taken constitutes an element which may be considered insofar as it influences the market value of the land.' [Citations.]" (*Ventura*

7

*County Flood Control Dist. v. Campbell* (1999) 71 Cal.App.4th 211, 219 (*Ventura*); see also 4 Nichols on Eminent Domain (3d ed. 1997) § 13.14 [existence of mineral deposits are an element in valuing land]; 1 Matteoni & Veit, Condemnation Practice in Cal. (Cont.Ed.Bar 3d ed. 2005) § 4.87, p. 141 ["A right to future exploitation of undeveloped natural resources has a present and ascertainable value."]; 29A C.J.S. Eminent Domain § 179, p. 341 ["Mineral rights in lands have ascertainable market value, to be considered in fixing the compensation for the taking of lands in condemnation proceedings, even though there is an element of speculation in such rights."]; 27 Am. Jur. 2d Eminent Domain § 586, pp. 211-212 ["[E]vidence of the value of mineral deposits on a condemned property is relevant, not to establish the separate value of the deposits, but to establish the value of overall property as enhanced by the deposits."].) "Although it is generally not proper to reach an award by separately evaluating the land and the deposits, 'it is possible to capitalize potential royalties, by multiplying the reasonably probable royalty rate by the estimated tonnage of mineral in place and reducing the result to present value.'" (*Ventura*, *supra*, at pp. 219-220.) "Such evidence is proper where there is proof of an active market for the minerals in question, that such transactions commonly take the form of royalty payments and that the estimate for recoverable deposits is not too speculative. [Citation.] 'This method results in an accurate assessment of the capitalized net profit which the condemnee could expect to realize, if the condemnee remained in possession and performed the work, and it is that interest which the condemnee would be able to market to a willing buyer desiring to perform the extraction and realize those profits for itself.'" (*Id.* at p. 220.)

It is important to note that while lost business profits are not compensable as an element of damage in an eminent domain proceeding, "evidence of economic feasibility of a claimed highest and best use of the property bears upon market value and is, therefore, admissible." (*Orange County Flood Control Dist. v. Sunny Crest Dairy, Inc.* (1978) 77 Cal.App.3d 742, 759.) Stated differently, "a defendant may not present evidence of income from a business that is *conducted on* the condemned property, but may offer proof of rental income from the *property itself* and any improvements presently in existence." (*Brocchini Farms*, *supra*, 92 Cal.App.4th at pp. 198-199.)

As one commentator explained, the "[v]aluation of mineral properties is difficult and to a degree speculative, but this does not preclude their having ascertainable market value." (Montano, *Valuation of Lands with Mineral Deposits* (Jan. 7, 1993) C791 ALI-ABA 269, 272 (Montano).) First, evidence must be presented showing that development of minerals is compatible with the highest and best use of the property. (*Ibid.*) After it is established that development of minerals is a proper use, the next step in the process is to determine the proper approach to value the property. (*Id.* at pp. 272-273.) While the comparable sales approach is the most reliable and easiest, other approaches may be used if it is established there is a lack of comparable sales. (*Id*. at p. 273.) In this situation, "use of income generated from the land, as opposed to income generated from a business conducted on the land, may be used to determine the value of mineral bearing lands." (*Id.* at p. 274.)

The income approach to value requires expert testimony regarding (1) the existence of the deposit, (2) the quantity and quality of the deposit, (3) whether a market

9

exists for the deposit, and (4) the net income projected over the life of the deposit. (Montano, *supra*, at pp. 276-277.)  "The net income is then capitalized using appropriate capitalization rate and in the process discounted to determine the present worth of the projected future income." (*Id.* at p. 277.)  The "present value for minerals may be determined by estimating future income over a period of time, and capitalizing that income to determine its present value." (*Ibid.*)  Finally, a real estate appraiser testifies as to the overall market value of the land, including the overall influence of the mineral deposits.  (*Id.* at p. 278.)

Real estate developers have also created their own internal method of valuing land, called the "developer's approach" or "residual land value" approach.  (Miller & Starr, *supra*, § 30A:26, p. 66.)  This valuation method "starts with the presumed value of the finished product, such as a housing tract, apartment complex or commercial building. The developer then subtracts costs of marketing the product, building the improvements and obtaining development entitlements to end with the portion of the finished product value attributable to the land.  This residual land value guides the amount a real estate developer will offer to purchase land.  [Citations.]  The courts have rejected the use of this residual land value or 'developer's approach' in eminent domain cases.  [Citations.] Such an approach is speculative and subject to vagaries and contingencies of the market and the costs of development in the future.  [Citations.]" (*Id.* at pp. 66-67.)

Where, as here, property acquired by eminent domain is part of a larger parcel, compensation must be awarded not only for the part taken, but also for the injury, if any, to the remainder. (§ 1263.410, subd. (a).)  This compensation, called severance damages,

10

is computed by subtracting the fair market value of the remainder after the project is completed from its fair market value before the project. (See CACI No. 3511.)

2. Standard of Review

SDG&E appeals from the final judgment and from the order denying its JNOV motion. Our review of the judgment and the order denying a JNOV motion is the same where, as here, the JNOV motion does not raise a pure question of law or an issue based on undisputed facts. (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.)

When an appellant claims a factual finding is not supported by substantial evidence, our power "'*begins* and *ends* with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support'" the finding. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) We presume that the record contains evidence sufficient to support the judgment; it is the appellant's burden to demonstrate otherwise. (*Ibid.*) We do not reweigh evidence or assess the credibility of witnesses on review for substantial evidence. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630.) Evidence is substantial if it is of "ponderable legal significance . . . reasonable, credible and of solid value." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651.) An expert's opinion is substantial evidence if it has evidentiary support and is accompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion. (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.) While inferences may support a judgment, "the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion,

11

imagination, speculation, surmise, conjecture or guesswork."  (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204.)

3.  Analysis

As a preliminary matter, SDG&E does not challenge the admissibility of Coalson's and Anderson's expert testimony; rather, it asserts defendants' evidence was legally insufficient to support the verdict.  Although somewhat unclear, SDG&E appears to argue that the evidence was insufficient to show that a mining operation was the highest and best use of the property and, even assuming a mining operation was the highest and best use, the valuation method used by defendants was improper.

We first address SDG&E's argument that the evidence was insufficient to show a mining operation was the highest and best use of the property because the evidence failed to show a mining operation was reasonably probable.  This argument contains several subparts.  SDG&E first asserts that the developer's rule or approach precluded defendants' theory that a mining operation was the highest and best use for the property.  We disagree.

The developer's approach begins with the presumed value of the finished product and then subtracts the costs of marketing the product, building the improvements and obtaining development entitlements to produce a number reflecting the portion of the finished product value attributable to the land.  (Miller & Starr, *supra*, § 30A:26, pp. 66-67.)  Comparing this description of the developer's approach with Coalson's and Anderson's testimony, as summarized below, shows defendants did *not* use the developer's approach to determine the highest and best use of the property.  Rather,

12

defendants used the income approach, as outlined above (*ante*, Part I.A.1), to determine the highest and best use of the property and then to appraise it.

SDG&E also argues that the developer's rule precluded defendants' experts from testifying that the highest and best use of the property was a mining operation because such an operation did not currently exist on the property. We reject this assertion as a condemnee may present evidence that the property is suitable for a particular purpose even if the property has not yet been developed to that particular highest and best use. (*Andresen*, *supra*, 193 Cal.App.3d at pp. 1159-1160.) Moreover, ample authority supported the income approach used by defendants where, as here, the property at issue contains undeveloped natural resources. (*Ante*, Part I.A.1.)

Defendants presented undisputed evidence showing the quantity and quality of the deposit and that a market existed for the deposit. Testing of core samples taken from the property revealed "very hard, very durable" material suitable for use as construction aggregate "by a wide margin." Coalson estimated that the property could yield about 2.4 tons per cubic yard of aggregate. Coalson was familiar with the supply and demand of construction aggregates in and around the County and had completed a market study for construction aggregates. Coalson explained that there is a shortage of permitted construction aggregate sites in the County and unless new sites were opened, the County would completely exhaust its available construction aggregate by 2020 if the demand was high or 2030 if the demand was low. After looking at existing quarries, Coalson concluded that the County's long-term demand for construction aggregate could not be met by simply expanding currently permitted mines.

13

Coalson explained that property is generally made available for mining through a royalty agreement where a mine operator pays the property owner for the value of the minerals exported from the site. The royalty is expressed as a percentage of the average sales price of all the commodities produced on the property. Although royalty rates could vary greatly, Coalson opined that an appropriate royalty rate for defendants' property would be 15 percent based on the growing demand and diminishing supply for construction aggregate. Coalson testified that he expected a buyer and seller in the marketplace on the date of value to rely on a discounted cash flow analysis regarding the value of defendants' property.

Anderson testified that mining the property was the highest and best use after concluding that mining was physically possible, legally permissible and financially feasible. Anderson concluded that a mining operation was the highest and best use of defendants' property and that the proper appraisal method for mining extraction was the income approach, which included direct income capitalization and a discounted cash flow type of analysis. Although Anderson also applied a sales comparison approach to value the property, he did not find a lot of vacant properties for sale with construction aggregate reserves. He found three properties, but eliminated two of the properties as not comparable. This left him with one piece of property. He concluded that this was not enough information to conduct a sales comparison approach evaluation analysis.

Anderson explained that the discounted cash flow analysis "takes a series of cash flow payments out into the future and mathematically brings it back to a net present value of those cash flows as discounted by an appropriate rate." He considered the discounted

14

cash flow method as the only appropriate method for valuing the property on the date of valuation because taking granite out of the ground takes years. Anderson explained that he was valuing the property and its resources and not a business on the property.

The discounted cash flow method examines a number of variables over time and then discounts future income back to present value. These variables include the total tons of material that could be extracted from the ground on a yearly basis to determine the amount of time it would take to remove all of the material (127 million tons) at 2 million tons per year. To determine the price of the material, Anderson referred to a Region Aggregate Supply Study prepared in 2011 for the San Diego Association of Governments (SANDAG) that was funded mostly by CALTRANS (the SANDAG Study). Coalson was a very active member of the technical review panel for the SANDAG Study.

Based on the SANDAG Study, Anderson determined an average price per ton of $15 for this type of aggregate in the County. However, after reviewing all of the information, Anderson concluded that $11 per ton was appropriate as it took into account the risk of getting a MUP and provided an additional incentive for a prospective buyer. After consulting a number of sources, Anderson agreed with Coalson that a royalty rate of 15 percent was appropriate. He explained that the royalty rate represented the rent someone would pay a property owner for the right to mine the resources on the property.

Anderson then determined the average or stabilized income stream that would flow to the landowner leasing the property for mining at $3.3 million per year. This figure was based on a 15 percent royalty for 2 million tons per year at $11 per ton. He also looked at the discount rate, meaning the method of bringing the future value of

15

money back to a present number. After discussing the discount rate with a number of individuals, Anderson concluded that a discount rate of 8.5 percent was appropriate. Anderson also applied a 50 percent surcharge to the discount rate to reflect the risk involved with the property not being permitted on the date of valuation. After taking into account all of these factors, Anderson concluded that the property was worth $10,359,000 in its before condition.

Anderson determined the amount of severance damages at $8.482 million, which represented the portion of the property left after SDG&E had taken its part but while considering the value of the property taken when it was part of an integrated whole. After considering the rights that were taken by SDG&E, Anderson reanalyzed the remainder's highest and best use in the after condition. Anderson explained that SDG&E's easement ran down the middle of the property, taking up about 22 acres and essentially splitting the property in half. Anderson concluded that the property after SDG&E's taking was no longer feasible for mining. He thus concluded that the highest and best use for the remainder in the after condition was agricultural and low density residential using a sales comparison approach because a discounted cash flow analysis was no longer applicable. Using this method, Anderson concluded that the value of the property in its after condition was $20,000 per acre, resulting in a value of $1.86 million for the property and representing severance damages of $6,622,000. Thus, the total just compensation for the taking and the impacts to the property was $8,499,000. In summary, this testimony shows defendants used the income approach to value the property, not the developer's approach.

16

SDG&E next complains that defendants presented no evidence showing mining the property would be profitable and that it was reasonably probable anyone would have invested in the property had defendants offered it for lease. Stated differently, SDG&E claims defendants failed to present any evidence showing mining the property was economically feasible. We disagree.

Anderson concluded that mining the property was financially feasible. Specifically, Anderson testified that based on the low supply of aggregate in the area and the high demand for aggregate, that defendants' property would be appealing to a mining investor because it presented an opportunity "to make a lot of money." Based on this testimony, the jury could infer it was reasonably probable an investor would have leased the property had defendants offered it for lease. Significantly, SDG&E presented no evidence disputing Anderson's testimony.

SDG&E asserts no rational trier of fact could have found a reasonable probability the County would have granted a MUP for the proposed mining operation, noting that defendants' experts never expressly testified that obtaining a MUP was reasonably probable and other evidence in the record suggested important reasons existed for the County to deny a MUP. SDG&E attacks (1) Coalson's opinion that the County would have acted on a MUP within three to five years as pure conjecture and (2) Anderson's testimony that a 71.4 percent (or any other) probability existed that the County would have granted a MUP.

First, as defendants correctly note, valuating property in *any* condemnation action is inherently speculative as it involves a hypothetical buyer and seller in a fictionalized

17

transaction. (§ 1263.320, subd. (a).) This case is made more difficult and complex because it involves mineral deposits. Juries, however, are instructed on the limitations of expert testimony and are "able time after time to render verdicts in eminent domain trials that are not disturbed on appeal." (*City of Livermore v. Baca* (2012) 205 Cal.App.4th 1460, 1470.)

Here, the trial court instructed the jury on deciding the believability of a witness's testimony (CACI No. 107), evaluating expert testimony (CACI No. 219) and evaluating hypothetical questions (CACI No. 220). The trial court also instructed the jury that neither party had the burden to prove the amount of just compensation (CACI No. 3514), explained the concept of highest and best use (CACI No. 3502) and how to evaluate witness testimony regarding the value of the property (CACI No. 3515). Finally, the trial court specially instructed the jury that mineral resources may be valued using a discounted cash flow method and it could reject evidence it found speculative or conjectural in deciding severance damages and the highest and best use of the property. SDG&E does not assert that the jury instructions were incorrect or insufficient.

While SDG&E is correct that defendants' experts never expressly testified that obtaining a MUP was "reasonably probable," there was sufficient evidence in the record from which the jury could so infer. Coalson explained that unless new construction aggregate sites were permitted and opened, the County would completely exhaust its available construction aggregate by 2020 or 2030. He concluded that the County's long-term demand for construction aggregate could not be met by simply expanding currently

18

permitted mines and explained that trucking construction aggregate into the County is expensive and affects the air quality.

The SANDAG Study and the "County of San Diego Guidelines for Determining Significance and Report Format and Content Requirements – Mineral Requirements" both concluded a need existed for locally produced aggregate. A stated goal of the County General Plan as adopted by the County Board of Supervisors was to "streamline the permitting of new mining facilities consistent with the goal to establish permitted aggregate resources that are sufficient to satisfy 50 years of County demand." Coalson testified that the County policy as stated in the General Plan implies that it should be easier to get a mining permit. Anderson similarly testified that permitting proposed mines would be streamlined based on the shortage of aggregate supplies for the next 50 years. Anderson also testified regarding a document adopted by the County relating to the California Environmental Quality Act (CEQA) and the process of getting a mining operation permitted. This document concluded that permitted mining needed to be increased in order to meet long-term goals.

Coalson explained that leasing property for potential mining use is risky, but sophisticated parties understand the inherent risks and these risks do not stop market participants from engaging in their business. He believed that the risks of permitting would decrease based on the critical shortage of aggregates. Coalson stated that he assisted many mining operators in the Lakeside area to secure mining permits and had a 100 percent success rate. From this evidence, the jury could rationally infer that obtaining a MUP was reasonably probable.

19

SDG&E attacks Coalson's opinion that the County would have acted on a MUP within three to five years as pure conjecture. We disagree. Based on his knowledge, Coalson believed it would take three to five years to complete the permitting process for defendants' property. All of his other successful mining applications have taken less time, but he afforded more time for this project as it would be a new operation. He explained that it took about six months to put together a good mining permit application, 18 months for the County to review the application and one year to get the application to the Board of Supervisors. This estimate included CEQA processing.

Anderson testified that he investigated the County's history of issuing MUPs to mining operations starting in 1980 when this type of permit was first required as this is important in trying to forecast and understand a situation. Anderson considered this type of information as being "very important" to a market participant in determining the odds of obtaining a MUP and stated that an overall statistical review was more reliable than anecdotal examples because it looked at all of the data.

Anderson focused on "greenfield properties" or properties that did not have existing mining operations. He eliminated properties that had endangered species or native-American type issues. This left him with 22 applications, out of which 14 were approved amounting to a 71.4 percent statistical probability of obtaining a MUP. Thus, Anderson concluded that defendants' property had a 71.4 percent or "very good" chance of obtaining a MUP. He then specifically looked at MUP applications in the Lakeside area, found that one application had been withdrawn and of the remaining four applications, all had been approved. From this, Anderson concluded a 100 percent

20

likelihood of success in obtaining a MUP. Looking at this same data, Anderson determined statistically that a MUP application took less than three years. Accordingly, the totality of the evidence before the jury shows that Coalson's and Anderson's three- to five-year timeframe was based on logic and reason and not purely conjectural. SDG&E was free to cast doubt on the reasoning used by defendants' experts via cross-examination or rebuttal by its own expert.

SDG&E attacks Anderson's testimony on numerous grounds, arguing Anderson was not a statistician, incorrectly calculated the numbers, used a flawed analysis equivalent to watching a coin flip and did not choose a representative sample. Based on these defects, SDG&E argues Anderson's conclusion that a 71.4 percent probability existed for obtaining a MUP was "meaningless." Taken to their essence, SDG&E's arguments amount to an assertion that the jury should not have believed Anderson. We reject this contention as we do not reweigh evidence or assess the credibility of witnesses on review for substantial evidence. (*Howard v. Owens Corning*, *supra*, 72 Cal.App.4th at p. 630; see *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 622 [whether expert's evaluation of defendant's future income potential was credible was an issue of fact].) Again, SDG&E was free to challenge or impeach Anderson during cross-examination and could have called its own experts to rebut Anderson's testimony.

Next, SDG&E argues that other evidence in the record suggests important reasons existed for the County to deny a MUP. Briefly, SDG&E cites evidence presented at trial supporting its contention that a mining operation on the property would impact neighbors and the scenic environment, impact local traffic and require the importation of water.

21

These facts go to the weight of the evidence and were matters for the jury to decide. Moreover, Coalson testified that the need for storm water and air pollution control permits did not pose an obstacle. He opined there were no biological hurdles to prevent defendants' property from being approved for mining because it was not within the preapproved mitigation area, "there [was] really nothing significant about the habitat on the site" and mitigation credits could be purchased off-site. Coalson explained that roadway widening and encroachment permits from CALTRANS were typical and he never had a mining permit application unapproved for this reason.

Coalson also addressed possible impediments to a mining operation on defendants' property, including neighborhood opposition and water supply. Although Coalson noted there would be opposition, he stated that the area had a reduced population that has accepted that mining is prevalent in the area and "there hasn't been any major opposition" to previous mining projects he had worked on. Coalson conceded there was inadequate water on the site to serve the operation, but stated water could be trucked in and several mining operations in the County imported water. It was for the jury to weigh all the evidence and decide whether obtaining a MUP for the property was reasonably probable.

Having concluded that the evidence supported the conclusion that a mining operation was the highest and best use of the property, we turn to the valuation method used by defendants. SDG&E asserts a new trial is required because Anderson's discounted cash flow analysis violated Evidence Code section 819 and the developer's rule precluded defendants' expert from valuing the property using the discounted cash flow methodology because there was no existing mining operation on the property.

22

SDG&E also contends it was pure speculation for Anderson to assume the County would have granted a permit for the operation as Coalson conceived it, with no conditions or restrictions affecting its output and the income stream to defendants.

First, the trial court specially instructed the jury that mineral resources could be valued using a discounted cash flow method and it could reject evidence it found speculative or conjectural in deciding severance damages and the highest and best use of the property. SDG&E does not argue that it challenged this special instruction and our review of the court's discussion with counsel regarding jury instructions shows the parties did not address this instruction. Accordingly, SDG&E forfeited any alleged error to valuing the property using a discounted cash flow method.

Even assuming the issue had not been forfeited, we would reject SDG&E's arguments on their merits. The courts in *Ventura* and *Anderson* approved the discounted cash flow methodology for the valuation of mineral deposits. (*Ventura*, *supra*, 71 Cal.App.4th at pp. 219-220; *Andresen*, *supra*, 193 Cal.App.3d at pp. 1160-1161.) Additionally, our independent research shows a number of courts in different jurisdictions have accepted the method for the valuation of mineral deposits. (See e.g., *Maricopa County v. Barkley* (1990) 168 Ariz. 234, 241-242; *United States v. 22.80 Acres of Land* (9th Cir. 1988) 839 F.2d 1362, 1364-1365; *United States v. 103.38 Acres of Land* (6th Cir. 1981) 660 F.2d 208, 212-215.)

We reject SDG&E's assertion that the discounted cash flow method violated Evidence Code section 819, which states, "When relevant to the determination of the value of property, a witness may take into account as a basis for his opinion the

23

*capitalized value of the reasonable net rental value attributable to the land and existing improvements thereon* (as distinguished from the capitalized value of the income or profits attributable to the business conducted thereon)." (Italics added.) SDG&E appears to focus on the language regarding "existing improvements" to argue the statute does not apply here because there were no existing improvements. This argument ignores that Evidence Code section 819 allows "the capitalized value of the reasonable net rental value attributable to the land."

SDG&E's reliance on *Cushman* to support its position is misplaced. In *Cushman*, the condemned property contained a retail building. (*Cushman*, *supra*, 53 Cal.App.4th at p. 924.) The property owner's appraiser testified that the highest and best use of the property would be to expand the existing building. (*Ibid.*) The appraiser then presented evidence on fair market value of the property based on capitalization of income derived from "a nonexisting improvement." (*Id.* at p. 929.) The appellate court concluded that the evidence was improperly admitted because Evidence Code section 819 did not sanction capitalization of the reasonable rental value attributable to planned or future improvements not in existence as of the date of value. (*Id.* at p. 930.) We have no quarrel with the result in *Cushman* as we agree it is improper to capitalize income for a nonexisting improvement. Here, Anderson did not capitalize income for a nonexisting improvement; rather, he capitalized rental income attributable to the land itself—which Evidence Code section 819 expressly allows. (See *Brocchini Farms*, *supra*, 92 Cal.App.4th at pp. 198-199.) As such, SDG&E's continued citation to the developer's rule is inapt.

24

Finally, SDG&E asserts a new trial is required because Anderson used an arbitrary discount rate of his own making that lacked evidentiary support.  Not so.

The discount rate is the method of bringing the future value of money back to a present number.  Anderson discussed the discount rate with a number of individuals and concluded that a discount rate of 8.5 percent was appropriate. Anderson then applied a 50 percent surcharge to the discount rate to reflect the risk involved with the property not being permitted on the date of valuation.  This doubled the discount rate to 17 percent to reflect the uncertainties in the market.  This testimony shows that Anderson's discount rate was not pulled out of "thin air" but was based on reason and logic.  Whether the information Anderson relied on was sufficient to support his opinion was a circumstance that went to the weight the jury should give the evidence, but did not affect its admissibility.  (See *People v. Fulcher* (2006) 136 Cal.App.4th 41, 54 [any erroneous factual assumptions by expert could be addressed through cross-examination by showing there was no evidence to support the conclusion, therefore the objection goes to the weight not the admissibility of the expert's opinion].)

B.  The Trial Court's Evidentiary Rulings

SDG&E asserts it is entitled to a new trial because the trial court committed reversible error by (1) sustaining defendants' hearsay objections and preventing it from cross-examining Anderson about the factual basis for his opinion, and (2) refusing to allow Anderson to testify that Coalson said it was a "crapshoot" whether the County would have issued a MUP.  We examine each contention in turn.

1. General Legal Principles

Matter that is ordinarily inadmissible "can form the proper basis for an expert's opinion testimony." (*People v. Gardeley* (1996) 14 Cal.4th 605, 618; Evid. Code, § 801, subd. (b) [an expert's opinion may be based on matters known to the expert "whether or not admissible"].) On direct examination, expert witnesses giving opinion testimony may testify to the reasons for their opinion and the matter upon which it is based, unless they are precluded by law from using such reasons or matter. (Evid. Code, § 802.) During cross-examination, expert witnesses may be questioned regarding their qualifications, the subject to which their expertise relates, and the basis of their opinion. (Evid. Code, § 721, subd. (a).)

Generally, parties are given wide latitude when cross-examining an expert witness to test the credibility of the expert. (*People v. Coleman* (1985) 38 Cal.3d 69, 90.) Accordingly, "a broader range of evidence may be properly used on cross-examination to test and diminish the weight to be given the expert opinion than is admissible on direct examination to fortify the opinion." (*Id.* at p. 92.) For example, "a party seeking to attack the credibility of the expert may bring to the attention of the jury material relevant to the issue on which the expert has offered an opinion of which the expert was unaware or which he did not consider. The purpose and permissible scope of impeachment of an expert is to call into question the truthfulness of the witness's testimony." (*People v. Bell* (1989) 49 Cal.3d 502, 532.)

We review the trial court's ruling on the admissibility of evidence for abuse of discretion. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 332.) The erroneous

26

exclusion of evidence does not require reversal except where the error caused a miscarriage of justice. (*Ibid.*; Evid. Code, § 354; Cal. Const., art. VI, § 13.) "'[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Richardson* (2008) 43 Cal.4th 959, 1001.)

2. Cross-Examination of Anderson Regarding MUP

a. Facts

During cross-examination, Anderson testified that his assistant contacted Jim Bennett, the County's planner or geologist to, among other things, ask about the likelihood of obtaining a MUP for the property. Referring to an exchange of emails between the assistant and Bennett, SDG&E asked, "Isn't it a fact that [Bennett] said he could not provide a likelihood of any given mine proposal success in the county?" The trial court, however, sustained defendants' hearsay objection.

SDG&E then established that Anderson's assistant had contacted Bennett at Anderson's request "to provide [Anderson] with [Bennett's] opinion about whether or not there was a probability that [defendants'] property could obtain a major use permit." After Anderson acknowledged receiving a copy of the emails between his assistant and Bennett, SDG&E asked whether it was true "that . . . Bennett was unwilling to provide a success rate for mining [defendants'] property." Defendants again objected on the ground of hearsay, and the court sustained the objection, citing *People v. Dean* (2009) 174 Cal.App.4th 186, explaining, "Experts can properly and credibly place before the jury

27

matters that they relied upon and the nature of those matters without testifying as to the specific details of the hearsay. Sustained on that basis." Anderson then testified that MUP applications are considered on a case-by-case basis and disagreed with counsel's statement that considering past MUP applications was not a reliable indicator of what could happen on other mining properties.

b. Analysis

SDG&E first asserts it is entitled to a new trial because the court committed reversible error by refusing to allow it to elicit cross-examination testimony from Anderson that Bennett told him there was no way to predict the outcome on a MUP application. The record shows that several times during trial, SDG&E asked Anderson what Bennett had told him. The trial court sustained defendants' hearsay objections. " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated. [¶] . . . Except as provided by law, hearsay evidence is inadmissible." (Evid. Code, § 1200, subds. (a), (b).) Nonetheless, hearsay evidence may be admissible under an exception enumerated in the evidence code, other statutes or decisional law. (*People v. Otto* (2001) 26 Cal.4th 200, 207.)

Here, well-established decisional law gives parties wide latitude when cross-examining an expert witness to test the credibility of the expert. (*People v. Coleman*, *supra*, 38 Cal.3d at p. 90.) Additionally, expert witnesses may be questioned during cross-examination regarding the basis of their opinion. (Evid. Code, § 721, subd. (a).) Thus, the trial court erred by sustaining defendants' hearsay objections. We conclude,

28

however, that any error in excluding the evidence did not result in a miscarriage of justice.

Anderson's assistant asked Bennett about the likelihood of defendants' property obtaining a MUP for mining. Bennett responded, essentially stating he could not answer the question because (1) he did not have a proposal and there were unknown technical aspects and (2) it would not be "prudent" for him to make a prediction as he was not the decision maker. Because Bennett did not answer the question, it is unlikely the response played any part in forming the basis of Anderson's opinion. (Evid. Code, § 721, subd. (a).) Additionally, we fail to see how Bennett's "non-opinion" impeached Anderson's testimony. Anderson relied on Coalson's concept plan for the property, explored the feasibility of mining defendants' property and testified regarding the likelihood of obtaining a MUP. Additionally, as defendants point out, SDG&E could have designated Bennett as an expert. (§ 1258.210.)

3. Cross-Examination of Anderson Regarding "Crapshoot" Comment

a. Facts

During cross-examination, SDG&E asked Anderson about a written note relating to a conversation his assistant Steve Valdez had with Coalson. After Anderson recalled seeing multiple notes, SDG&E asked, "[D]id you identify that . . . Coalson had indicated that getting a MUP for [defendants'] property was a crapshoot?" Defendants objected on hearsay grounds with the court asking SDG&E if an exception applied and SDG&E responding that the business record exception applied. The trial court suggested that

29

SDG&E show the business record to Anderson, but SDG&E withdrew its line of questioning.

SDG&E later asked Anderson, "[I]sn't it true that during your dealings with valuing the property between you and Steve Valdez and . . . Coalson, that . . . Coalson indicated . . . it was a crap shoot whether or not they could get a[] MUP?"  Defendants objected to SDG&E's question "on foundation and hearsay," and the trial court sustained the objection.  When SDG&E offered to lay a foundation, the court said, "I don't know that you'll be able to get around the hearsay rule."

b.  Analysis

SDG&E asserts it is entitled to a new trial because the trial court committed reversible error by sustaining defendants' hearsay objection and refusing to allow Anderson to testify that Coalson said it was a "crapshoot" whether the County would have issued a MUP.  We disagree.

If evidence contains multiple hearsay, an exception for each level of hearsay must be found in order for the evidence to be admissible.  (Evid. Code, § 1201; *Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1205.)  Here, SDG&E's question contained two layers of hearsay: (1) the conversation Valdez had with Coalson and (2) the note written by Valdez about the conversation.  The second layer of hearsay falls within the business records exception to the hearsay rule.  (Evid. Code, § 1271.)  SDG&E, however, has not explained how the conversation Valdez had with Coalson fell within an exception to the hearsay rule.  Moreover, SDG&E had Valdez under subpoena

30

and could have called him as a witness. Alternatively, it could have asked Coalson directly about his comment to Valdez.

## II. *Defendants' Cross-Appeal regarding Litigation Expenses*

### A. Additional Facts

The parties exchanged their final offer and demand for settlement with SDG&E offering $829,000 and defendants demanding $5.5 million. By the eve of trial, SDG&E increased its offer to $954,000 and defendants lowered their demand to $4.5 million. The jury determined that SDG&E owed defendants just compensation of $8,034,000. Defendants moved to recover their litigation expenses under section 1250.410, seeking about $656,839 in expert fees and attorney fees and about $19,504 in costs. The trial court found defendants' demand was reasonable, but denied the motion as it could not say SDG&E's final offer was unreasonable. The court stated the following:

> "[G]iven the complexity of mining and obtaining permission to mine, it remains possible that even without its own expert SDG&E felt that it could undermine Coalson's opinions sufficiently that the jury would reject them. The fact that SDG&E failed to do so via cross examination or otherwise is really "Monday morning quarterbacking." Thus, as in San *Diego Metropolitan Transit Development Board v. Cushman*[] (1997) 53 Cal.App.4th 918, it was not unreasonable for SDG&E to 'stick[] fast to its legal theory' that the [highest and best use] of the subject property was its current [highest and best use] and that [defendants'] proposed new mining use was speculative and conjectural. This was a reasonable position, albeit one which ultimately failed in execution."

### B. General Legal Principles and Standard of Review

Section 1250.410 provides for the pretrial exchange of a final offer of compensation by the plaintiff in an eminent domain action and a final demand for

31

compensation by the defendant. "These offers and demands shall be the only offers and demands considered by the court in determining the entitlement, if any, to litigation expenses." (§ 1250.410, subd. (a).) If the court finds plaintiff's offer unreasonable and defendant's demand reasonable when "viewed in the light of the evidence admitted and the compensation awarded in the proceeding," the costs allowed shall include the defendant's litigation expenses. (§ 1250.410, subd. (b).)

The purpose of section 1250.410 is to encourage settlement of condemnation actions "using a carrot-and-stick approach: the party whose offer is reasonable can be awarded costs and attorney fees from the party whose offer was unreasonable." (*Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 168; *People ex rel. Dept. of Transportation v. Yuki* (1995) 31 Cal.App.4th 1754, 1763 (*Yuki*).) Before the trial court can award litigation expenses to the property owner, it must find both that the property owner's demand was reasonable and that the agency's offer was unreasonable. (*Inglewood Redevelopment Agency v. Aklilu* (2007) 153 Cal.App.4th 1095, 1117.)

Several guidelines exist to help determine the reasonableness of an offer or demand, namely (1) the amount of the difference between the demand or offer and the compensation awarded, (2) the percentage of difference between the demand or offer and the award, and (3) the good faith, care and accuracy with which the demand or offer was calculated. (*Los Angeles County Metropolitan Transportation Authority v. Continental Development Corp.* (1997) 16 Cal.4th 694, 720.) The mathematical relation between the highest offer and the ultimate award is only one factor entering into the trial court's determination; accordingly, our high court has disapproved any pronouncement

32

purporting to find unreasonableness as a matter of law based purely on mathematical disparity.  (*Id.* at pp. 720-721.)

"The trial court's determination of [reasonableness] will not be disturbed on appeal if supported by substantial evidence."  (*Redevelopment Agency v. Gilmore* (1985) 38 Cal.3d 790, 808.)  We do not reweigh the evidence presented, but consider the validity of the trial court's decision in light of the evidence presented on the relevant factors.  (*Yuki*, *supra*, 31 Cal.App.4th at p. 1763.)  " 'The measure of reasonableness is in the first instance a factual matter for the trial court,' unless 'the uncontradicted evidence permits only one conclusion . . . .'  [Citation.]"  (*Id.* at p. 1765; *Tracy Joint Unified School Dist. v. Pombo* (2010) 189 Cal.App.4th 889, 895 (*Pombo*) [same]; *People ex rel. Dept. of Transportation v. Acosta* (2009) 178 Cal.App.4th 762, 775 [same].)  After reviewing the case law, the *Pombo* court noted that "where relief was denied though numerical comparisons favored an award of expenses, the third factor pointed forcefully in the opposite direction."  (*Pombo*, *supra*, at pp. 897-898.)

C.  Analysis

The trial court found defendants' final $5.5 million settlement demand was reasonable and SDG&E does not challenge this finding.  We agree that defendants' final demand and their later pretrial demand of $4.5 million were reasonable in the light of the evidence admitted at trial and the compensation ultimately awarded by the jury.  Thus, we focus our analysis on whether SDG&E's final $829,000 settlement offer (later increased to $954,000) was reasonable in light of the evidence admitted at trial and the compensation awarded.  SDG&E's final offers were about $7.1 million less than the

33

verdict and amounted to about 11 percent of the verdict. Additionally, SDG&E's final offers were mere token increases from its ultimate valuation of $712,200. Based on pure mathematics, SDG&E's final offers were seemingly unreasonable.

We turn to the good faith, care and accuracy in how SDG&E determined the amount of its final offer. On this issue, defendants argue that SDG&E's appraiser never investigated mining as a highest and best use or seriously analyzed the mining use issue. Instead it chose to adhere to its appraisal of the property as a residential development. SDG&E asserts it acted in good faith because a fundamental disagreement existed between the parties over what was to be valued and, as the trial court found, it did not act unreasonably when it stuck to its legal theory regarding the highest and best use of the property. We cannot uphold the trial court's determination that SDG&E's offer was reasonable as the undisputed facts show only one conclusion was possible.

Defendants' evidence revealed that their property is located in a mining area and contained a large amount of very high quality material that could be mined for construction aggregate. They also presented evidence that the County's supply of construction aggregate was low and that the future demand for this material and new mining locations would be high. SDG&E presented absolutely no contrary evidence. Dating back to 1890, our high court recognized that a prospective mining claim has a market value and that witnesses should be permitted to testify as to their opinion and judgment of its value. (*Montana Railway Co. v. Warren* (1890) 137 U.S. 348, 352.) Stated differently, it is well established that the existence of mineral resources on condemned property impacts the market value of land and is properly considered in

34

fixing the compensation for the taking of property in condemnation proceedings. (*Ante*, Part, I.A.1.) Moreover, the propriety of using the income approach, including the capitalization of royalties and discounting them to determine the present worth of projected future income as a method of valuing undeveloped natural resources, while complex and necessarily speculative, is far from an issue of first impression. (*Ante*, Part, I.A.3.) Finally, as our earlier discussion shows, SDG&E's challenges to defendants' appraisal method went to the weight of the evidence, not its admissibility. (*Ante*, Part, I.B.2 & 3.)

SDG&E's appraiser valued defendants' property by reviewing comparable sales, but there is no evidence that these "comparable" properties contained an undeveloped granite resource similar to that found on defendants' property. Rather, SDG&E's appraiser testified he had no knowledge whether the comparable properties had over 100 acres of granite. He was not aware whether any of the comparable properties bordered mining property, were the subject of discussion for a potential mine lease or had core samples drilled. In contrast, Anderson testified he could not use the comparable sales approach to value defendants' land as he found only one comparable property with construction aggregate reserves and this was insufficient to conduct a sales comparison approach evaluation analysis.

Counsel for SDG&E stated that the $125,000 difference in the final offer and later pretrial offer reflected that "an investor might 'pay a little more' for the property" based on the speculative mining use. It is unclear how SDG&E came up with this number as its appraiser never considered the mining potential of the property. SDG&E's last minute

35

addition of $125,000 to its final offer appears completely arbitrary, meaning it lacked care and accuracy, as it ignored Anderson's appraisal of the property. This increase is not evidence of SDG&E's good faith willingness to compromise on the question of value; rather, it reflected a take-it-or-leave-it attitude contrary to the spirit of compromise implicit in the statutory scheme.

We disagree with the trial court's assessment that similar to the condemning agency in *Cushman*, SDG&E merely stuck to a reasonable legal theory that it failed to execute. In *Cushman*, the parties' numerical valuations differed because they disagreed on the "the purely legal issue of whether any severance damages [were] owed." (*Cushman*, *supra*, 53 Cal.App.4th at p. 933.) As such, the appellate court concluded the trial court justifiably gave the good faith factor greater importance as "a condemning agency [need not] compromise its legal position just to avoid litigation." (*Ibid.*)

Here, the dispute centered on the highest and best use of the property, a factual issue. (*Cushman*, *supra*, 53 Cal.App.4th at p. 925.) Accordingly, SDG&E was not called upon to compromise a "legal position" to avoid litigation. Instead, SDG&E was required to exercise good faith, care and accuracy regarding a factual matter. On this point, the evidence presented at trial does not favor SDG&E as its shows SDG&E failed to give defendants' contrary appraisal any serious consideration. SDG&E presented the declaration of another appraiser in opposition to defendants' motion for litigation expenses who concluded mining the property was unlikely due to numerous hurdles defendants would need to overcome such as environmental restraints, regulatory issues, lack of adequate water, traffic and access concerns and public opposition. The statute,

36

however, requires a court to evaluate the reasonableness of an offer in "light of the evidence admitted" at trial. (§ 1250.410, subd. (b).) SDG&E did not present this evidence at trial. In any event, even if we were to consider the declaration of this second appraiser, the appraiser advised SDG&E regarding the "credibility and defensibility [of the opinions of defendants' experts]." These are factual matters that SDG&E could have (and should have) presented evidence on at trial. This declaration does not support SDG&E's implied suggestion that it carefully researched defendants' claimed highest and best use or the propriety of defendants' valuation method.

In summary, we conclude that the undisputed facts show SDG&E's final offer of compensation was unreasonable when viewed in the light of the evidence admitted and the compensation awarded in the proceeding. Accordingly, the trial court erred in denying defendants' motion for litigation expenses.

DISPOSITION

The judgment is affirmed. The court's order denying appellant's JNOV motion is affirmed. The order denying respondents' request for litigation expenses is reversed and the matter is remanded to the trial court to grant the motion and award defendants their reasonable litigation expenses under section 1250.410. Respondents are awarded their costs on appeal.

McINTYRE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

IRION, J.

**CERTIFIED FOR PUBLICATION**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT
DIVISION ONE
STATE OF CALIFORNIA

| | |
|---|---|
| SAN DIEGO GAS & ELECTRIC COMPANY,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>ARNOLD J. SCHMIDT, as Cotrustee, etc., et al.,<br><br>     Defendants and Appellants;<br><br>VALERIE SCHMIDT, as Cotrustee, etc.,<br><br>     Defendant and Respondent. | D062671<br><br>(Super. Ct. No. 37-2010-00094931-CU-EI-CTL) |
| SAN DIEGO GAS & ELECTRIC COMPANY,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>ARNOLD J. SCHMIDT et al.,<br><br>     Defendants and Appellants. | (Super. Ct. No. 37-2010-00094934-CU-EI-CTL)<br><br>ORDER MODIFYING OPINION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on July 21, 2014, and certified for

publication on August 13, 2014, be modified as follows:

1. On page 2, the first full paragraph, beginning "Plaintiff San Diego Gas" is deleted and the following paragraph is inserted in its place:

   Plaintiff San Diego Gas & Electric Company (SDG&E) initiated this eminent domain proceeding to condemn an easement for electric transmission lines across the property of defendants Arnold and Valerie Schmidt and Luis Naranjo after the parties could not agree on an appropriate valuation for the property. Agreeing with the property owner's experts that an open-pit mining operation was the "highest and best use" for the land, the jury valued the property at about $8 million. SDG&E appeals, contending the judgment and order denying its motion for judgment notwithstanding the verdict (JNOV) must be reversed. SDG&E argues that the evidence was legally insufficient to support the jury's verdict. SDG&E also contends it is entitled to a new trial because the trial court abused its discretion in (1) limiting the cross-examination of an appraisal expert and (2) allowing the appraiser to testify in violation of Evidence Code section 819. Arnold Schmidt and Luis Naranjo (together defendants) cross-appeal, asserting the trial court erred in denying their request for litigation expenses under Code of Civil Procedure section 1250.410. (Undesignated statutory references are to the Code of Civil Procedure.) We reject SDG&E's arguments and affirm the judgment and order denying JNOV. We reverse the order denying defendants' motion for litigation expenses.

2. On page 39, the full paragraph entitled "Disposition" is deleted and the following paragraph is inserted in its place:

   The judgment is affirmed. The court's order denying SDG&E's JNOV motion is affirmed. The order denying defendants' request for litigation expenses is reversed and the matter is remanded to the trial court to grant the motion and award defendants their reasonable litigation expenses under section 1250.410. Defendants are awarded their costs on appeal.

There is no change in the judgment.

MCINTYRE, Acting P. J.

Copies to: All parties

2

Filed 8/13/14

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE

SAN DIEGO GAS & ELECTRIC COMPANY,
Plaintiff and Appellant,
v.
ARNOLD J. SCHMIDT, Individually and as Trustee, etc. et al.,
Defendants and Appellants;
VALERIE SCHMIDT, as Trustee, etc.,
Defendant and Respondent.
**D062671**
**San Diego County No. 37-2010-00094931-CU-EI-CTL**
**San Diego County No. 37-2010-00094934-CU-EI-CTL**

THE COURT:

The opinion filed July 21, 2014, is ordered certified for publication.

McINTYRE, Acting P. J.

cc: All Parties